**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Roanoke Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 7:23-cr-034** |
| | ) | |
| **ROBERT LEON KING** | ) | |
| **Defendant** | ) | |

## MR. KING'S AMENDED MOTION TO DISMISS THE INDICTMENT

Robert Leon King, through counsel, moves the Court to dismiss the indictment and all three counts thereunder in this case as his prosecution violates his Second Amendment right to keep and bear arms.

### INTRODUCTION

Mr. King is charged in a three-count indictment with possession of firearms by a convicted felon in violation of 18 U.S.C. § 922(g)(1), possession of an unregistered firearm in violation of 26 U.S.C. § 5841, 5861(d), and 5871, and possession of electronic blasting caps by a felon in violation of 18 U.S.C. § 842(i) and 844(a). Mr. King respectfully moves the Court to dismiss the counts as all of the above Sections are unconstitutional as applied to Mr. King, and 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 842(i), 844(a) are unconstitutional on their face.

Second Amendment jurisprudence no longer relies upon an interest-balancing approach, but rather on an analysis of constitutional "text and history." *New York State Rifle & Pistol Association, Inc., et al. v. Bruen*, 142 S. Ct. 2111, 2129 (2022). Under this new doctrinal approach, 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 842(i), 844(a) are unconstitutional on their face and are specifically unconstitutional as applied to Mr. King. Additionally, 26 U.S.C. § 5841, 5861(d), and 5871, are unconstitutional as applied to Mr. King because but for the

1

unconstitutional prohibition against owning firearms, Mr. King would have been able to register the gun legally.

Therefore, as further explained below, this Court must dismiss the indictment against Mr. King.

## RELEVANT FACTS

On April 5, 2023, police entered 1006 Cascade Drive, Pembroke, VA, on a search warrant unrelated to Mr. King, to search for methamphetamine. Mr. King has not been charged with any drug charges related to this search and in fact, has never been convicted of any charges relating to drugs. Although 1006 Cascade Drive is owned by Timmy Chapman, Mr. King was staying at the home on the date of his arrest, along with 6 other people. As to be expected in a smaller home with 6 different residents, it was a warren of random items. China dolls, a collection of baseball caps, DVDs, a miniature suit of armor, wind chimes, beer steins, knives, and Christmas cards were strewn about the house with no rhyme nor reason. After searching for any narcotics in relation to the search not related to Mr. King, the police saw various firearms among the detritus, and requested another warrant.

Mr. King slept in a bedroom in the back of the home, where his ex-girlfriend, Ms. Tanya Martin Vaught also stayed. During the search, she was taken into custody due to an active state capias. While in custody of the officers, she claimed that she lived in the back bedroom with Mr. King, that there were firearms in a stool in the bedroom, but that she did not own any firearms, that they were Mr. King's firearms, and that she knew nothing about any firearms. Several firearms were found in the home and 4 electric blasting caps were found in the stool that Ms. Vaught pointed out. The blasting caps looked like bundles of blue and yellow wires wrapped with a sticker. According to ATF's investigation, these caps were manufactured no later than

1985, at least 38 years ago. Mr. King had never used these caps, in fact, no one had. Until ATF detonated the caps in a residential area, the caps had never been used or accidentally set off. The caps had to be connected to an electrical charge in order to explode, without it, they are inert. When found in Mr. King's room, the caps were not attached or connected to any type of electrical charge. In order to detonate the devices, ATF had to connect them to a car battery in order to start the electrical charge.

In a partially recorded interview, it sounds as if Mr. King admits to keeping at least one firearm for a friend to keep it out of the hands of a troubled teenager. In another recording, as he was being transported by police, Mr. King confirms this, and states he owned some guns because he "liked guns" as well as for self-protection, however he is clear that "I've never pulled a gun." At one point Mr. King says of the blasting caps, "I didn't even know what the hell they was." Throughout the transportation audio, the two agents confirm Mr. King is not violent, but they're concerned with other people who could use his guns.

Mr. King is a 60-year-old man who has been convicted of three felonies, two of which occurred back-to-back in the 1990s. The most recent, a driving charge, occurred 15 years ago; two of Mr. King's children had not yet been born, President Obama had not yet been elected, and *United States v. Heller* had just been announced. Mr. King was arrested due to "habitual offending" of traffic laws, which was a felony in Virginia, although it is no longer an active Virginia statute. Mr. King did not follow the rules of the road, which also led to several hiccups involving revoking probation. Prior to that, Mr. King plead nolo contendere and signed an *Alford* plea for allegedly committing two robberies, and he was sent to prison. Mr. King was released from prison (for the crimes for which he plead nolo contendre and Guilty via an *Alford* plea) so long ago that iPhones did not exist. The offenses were committed 28 years ago, when the internet

was new, smart phones did not exist, President Bill Clinton was in office, 5 of the 6 Justices in the majority of *Bruen* were not yet on the Supreme Court, and Mr. King was 32 years old. Mr. King was never convicted of a firearms offense.

On December 26, 2019, Governor Ralph Northam of the Commonwealth of Virginia signed a document restoring the rights of Mr. King. It states, in part, that: "Whereas, it appears that Robert Leon King has rejoined society free from state supervision and it seems appropriate to the Executive to remove certain of those political disabilities by restoring the right to vote, hold public office, serve on a jury, and to be a notary public."

## ARGUMENT

The Second Amendment states, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear arms, shall not be infringed." The right is now understood as an individual one that "belongs to all Americans"; and that "the people" referenced in the amendment includes everyone who is "part of [the] national community." *District of Columbia v. Heller*, 554 U.S. 570 (2008). Since the right to bear arms is an important, fundamental, individual right of the people, firearm restrictions are presumptively unlawful unless the Government can "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.

The Court purposefully clarified this test in *Bruen*, as the lower courts had been misapplying *Heller* by using a means-end scrutiny. *Id*. at 2127-29. Instead, there should be a bifurcated "text" and "history" analysis to be used in order to decide the constitutionality of all firearm regulations going forward. *See Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1321 (11th Cir. Mar. 9, 2023).

The following analysis is required in determining the constitutionality of firearm regulations:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'

*Bruen,* 142 S. Ct. at 2129-30 (citation omitted).

Thus, the first step in testing any Second Amendment regulation is whether the plain text of the amendment covers an individual's conduct. If it does, then the Government bears the burden at the second step of analysis – to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation" that was in existence "when the Bill of Rights was adopted in 1791." *Id*. at 2137.

The second step requires the Courts to determine whether such a regulation looks to a "general societal problem that has persisted since the 18th century", or if it is aimed at an issue that was "unimaginable" during the founding era. *Id*. at 2131-32. If the regulation is aimed at conduct familiar at the founding of our Nation, then "the lack of a **distinctly similar** historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id*. (emphasis added). However, if focused on "unimaginable" conduct at the time of the founding, then the modern regulation need only be "relevantly similar" to a historical counterpart. *Id*

It is not sufficient for the Government to show a "distinctly similar" regulation by pointing to one or two isolated examples or laws from a few of the original colonies, but rather to be a "tradition," the regulation must be similar to a "widespread" historical practice "broadly prohibiting" the conduct in question. *Bruen*, 142 S. Ct. at. 2137-38; see also *United States v.*

*Bullock*, 2023 WL 4232309, at *22 (June 28, 2023) (observing that *Bruen* cast doubt on the possibility that even three colonial regulations were enough to constitute a "tradition of regulation).

If a regulation is meant to curtail conduct "unimaginable" at the time of the founding and thus must be "relevantly similar" to a historical regulation, the Court suggests looking to "how and why the regulations burden a law-abiding citizen's right to armed self-defense" in order to determine if the regulation encompasses a historical tradition. *Bruen*, 142 S. Ct. at 2133. Under the "relevantly similar" standard, the Government must identify "a well-established and representative historical analogue, not a historical twin. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

### I. Prosecuting Mr. King under § 922(g)(1) for possessing a firearm as a felon violates the Constitution, both facially and as applied to Mr. King

#### a. The Second Amendment's plain text protects Mr. King's right to keep and bear arms.

Mr. King is a part of the citizenry directly protected by the Second Amendment; and his actions, allegedly owning firearms, is the exact conduct that the Amendment is meant to protect and enshrine as a constitutional right.

#### i. Mr. King is part of the national, political community

The Second Amendment protects the right of "the people" to keep and bear arms. Founding era dictionaries define "people" as "those who compose a community," and extending to "every person." *See, e.g.*, 2 Samuel Johnson, *A Dictionary of the English Language* (1766) ("A nation; those who compose a community"), *available at* https://tinyurl.com/y95erjwf; Thomas Dyche & William Pardon, *A New General English Dictionary* (14th ed. 1771) ("People" "signifies every person, or the whole collection of inhabitants in a nation or kingdom"), *available*

*at* https://tinyurl.com/uk4b4fxd. *Heller* consistently interpreted "the people" as "unambiguously refer[ing] to all members of the national community, not an unspecified subset." *Heller*, 554 U.S. at 580.  Relying on its earlier construction of "the people" in the Fourth Amendment, the Court observed that "the people" is "a term of art." *Id.* (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)).  "'[Its uses] sugges[t] that 'the people,'" as used across the Bill of Rights as well as in the preamble, "'refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.'" *Id.* at 579-81 (quoting *Verdugo-Urquidez*, 494 U.S. at 265). To suggest that the Second Amendment only protects certain members of the community, while the rest of the Bill of Rights protects everyone, transforms the Second Amendment into a second-class right, in direct contradiction of the decree of the Court. *See McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (making clear that subjecting the second Amendment "to an entirely different body of rules than the other Bill of Rights guarantees" would make it a second-class right). Further, a reading of "the people" in the Second Amendment as excluding "felons" would be contrary to text and at odds with the cardinal rule of statutory interpretation that "identical words used in different parts of the same statute are generally presumed to have the same meaning." *See IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005). Then-Judge Barrett, reading *Heller* to interpret "'the people' as referring to 'all Americans,'" rejected the notion that felons are "categorically excluded from our national community." *Kanter v. Barr*, 919 F.3d 437, 451-53 (7th Cir. 2019) (Barrett, J., dissenting).

Mr. King is a United States citizen, and he should be considered a member of the national community regardless of his criminal history. However, should there be any question as to whether Mr. King, by nature of his decades-old felony convictions, is a fully unabridged member

of the national community and citizen of the United States, the Commonwealth of Virginia restored his rights on 26 November 2019. That means Mr. King can: vote for elected officials up and down the ballot; he can sit on a jury to determine whether someone is guilty of a violation of § 922(g)(1); he can notarize a bill of sale for a firearm; and he could, theoretically, run for the office of the President of the United States, hold the nuclear codes, and order thousands of men and women with guns to go to war, but could not hold a gun himself. This dichotomy is exactly illustrative of why "the people" as described in the Second Amendment is necessarily inclusive of "the people" in the rest of the Bill of Rights, and of those with felonies in their past.

Mr. King is a member of the national community; the Second Amendment applies to him.

### ii.  It is not proper to rely on unanalyzed dicta to find that the Second Amendment does not apply to Mr. King

In recent appellate cases, the Government has argued that the Second Amendment does not apply to all members of the national community, but rather only to "law-abiding, responsible citizens." *See Range v. Attorney General*, 69 F. 4th 96, 101 (3d Cir. 2023).  This argument is drawn from dicta in *Heller* and *Bruen*; specifically, the Court in *Heller* (a case in which felon-disarmament laws were not before the Court) stated:

> nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Heller,* 554 U.S. at 626-27.  In an accompanying footnote, the Court described these prohibitions as "presumptively lawful regulatory measures."  *Id.* at 627 n.26.

The Fourth Circuit has made it abundantly clear that a footnote should not be used to "establish a general rule," and that the *Bruen* test shall be used when determining Second

8

Amendment challenges, **not** a reliance on dicta. *See Maryland Shall Issue, Inc. v. Moore*, 2023

WL 8043827 (4ᵗʰ Cir. Nov. 21, 2023). Specifically, the Court states:

> *Bruen* was not shy about telling lower courts how to handle Second Amendment challenges: We turn to the Amendment's "text," "informed by history," and by "the historical tradition that delimits the outer bounds of the right." *Bruen*, 142 S. Ct. at 2127. So if we have to choose between the outcome dictated by text, history and tradition and the outcome hinted at in dicta, it is no contest: Text, history, and tradition wins every time.

*Id*, Note 9.

While lower courts should "give great weight to Supreme Court dicta," *N.L.R.B. v.*

*Bluefield Hosp. Co., LLC*, 821 F.3d 534, 541 n.6 (4th Cir. 2016), when there is an "extended

discussion" of an issue, the Court gives "full and careful consideration to the matter," and the

issue is "important, if not essential, to the Court's analysis," *Hengle v. Treppa*, 19 F.4th 324,

346-47 (4th Cir. 2021); courts are by no means bound by dicta especially if it is "unaccompanied

by any analysis from which [it] might gain insight into the Court's reasoning." *In re Bateman*,

515 F.3d 272, 282, 283 (4th Cir. 2008) (refusing to "afford[] talismanic effect" to unexplained

Supreme Court dicta). *Heller*'s discussion of "presumptively lawful regulatory measures" is

exactly the kind of Supreme Court dicta unentitled to "talismanic effect." *Id.* at 283. There was

specifically no analysis in *Heller* or its progeny regarding the right of felons to carry firearms,

and the Court specifically stated, "[a]lthough we do not undertake an exhaustive historical

analysis today of the full scope of the Second Amendment…" prior to mentioning "longstanding

prohibitions" against felons. *Heller*, 554 U.S. at 626. While the Court described felon-

disarmament laws as "longstanding," 554 U.S. at 626, it "never actually addressed the historical

pedigree" of those laws, *Kanter v. Barr*, 919 F.3d 437, 445 (7th Cir. 2019); *see also Heller*, 554

U.S. at 721 ("The majority fails to cite any colonial analogues" for more recent prohibitions it

claimed would pass Second Amendment muster) (Stevens, Souter, Ginsburg, & Breyer,

dissenting).  Indeed, other Courts that have found § 922(g) inconsistent with the Second

Amendment have refused to use such stray language from *Heller* or *Bruen* to find that this

Constitutional protection is only reserved for "law-abiding, responsible citizens." *Range*, 69 F.

4th at 101; *United States v. Daniels*, 2023 U.S. App. LEXIS 20870 (August 9, 2023) (citing

*United States v. Rahimi*, 61 F.4th 443, 453 (5th Cir. 2023), ***cert. granted***; *United States v. Bullock*,

2023 WL 4232309 (June 28, 2023); *United States v. Quailes*, 2023 U.S. Dist. LEXIS 147657

(August 22, 2023).

Given that the above language is merely dicta and was never analyzed nor litigated fully

before the Court, it should not be used to determine that Mr. King is not part of "the people"

protected by the Second Amendment. The Government should be required to address whether

there is a longstanding prohibition against felons owning firearms through the mechanism laid

out in *Bruen* – whether such a regulation is consistent with the Nation's historical tradition.

Especially since, as discussed below, the Court's phrasing regarding a "longstanding

prohibition" is incorrect.

Even if the Court determines that only "law abiding citizens" can own firearms – at the

time of this offense, Mr. King was law abiding. He had paid back society by completing his

prison sentences and he was no longer on probation. His most recent crime, a felony, for driving

as a habitual offender, is no longer a crime in Virginia, it was repealed. At the time of this

alleged offense, the State of Virginia recognized him as a free, franchised, law-abiding citizen.

### iii. The action of owning firearms in the home is the exact conduct the Second Amendment protects

The Second Amendment is meant to protect the exact behavior that Mr. King is alleged to

have engaged in. The Government alleges that Mr. King owned several firearms, and that he kept

them in his home. In *Heller*, the Court specifically addressed what it meant to "keep arms." The

Court cited several definitions:

> Johnson defined "keep" as, most relevantly, "[t]o retain; not to lose," and "[t]o have in custody." Johnson 1095. Webster defined it as "[t]o hold; to retain in one's power or possession." No party has apprised us of an idiomatic meaning of "keep Arms." Thus, the most natural reading of "keep Arms" in the Second Amendment is to "have weapons."

*Heller*, 554 U.S. at 582. The possession of weapons is the exact behavior protected by the

Second Amendment. The Court was particularly protective of firearms kept in the home, "where

the need for defense of self, family, and property is most acute." *Id*. at 628. The lower courts

agree. *See Quailes*, 2023 U.S. Dist. LEXIS 147657 at *21-22 (citing *Bullock*, 2023 WL 4232309

at *28 (holding that the plain text of the Second Amendment covers Mr. Bullock's conduct,

which was "possession of ordinary firearms in the home"). Mr. King kept his firearms in the

home, the exact action protected by the Second Amendment.

Since 18 U.S.C. § 922(g)(1) regulates conduct the Second Amendment protects, section

922(g)(1)'s prohibition on felons possessing guns is presumptively unconstitutional under

*Bruen*'s plain text standard.

> b. *The Government will be unable to show a robust tradition of "distinctly similar" historical precursors to § 922(g)*

After determining that the Second Amendment protects Mr. King and his alleged

behavior, the next step requires the Government to show that §922(g) is "distinctly similar" to a

historical regulation. They will be unable to do so.

As a threshold matter, the burden of proof at Step Two rests entirely with the

government.  The government alone must "establish the relevant tradition of regulation." *Bruen,*

142 S. Ct. at 2135, 2149 n.25.  If it does not, courts "are not obliged to sift the historical

materials for evidence to sustain the [challenged] statute." *Id.* at 2150.  Rather, *Bruen* held,

consistent with ordinary "principle[s] of party presentation," courts must "decide a case based on the historical record compiled by the parties." *Id.* at 2130 n.6. If that record yields "uncertainties," the Court dictated, courts should rely on *Bruen*'s "default rules"—the presumption of unconstitutionality at Step One and the government's burden at Step Two— "to resolve [those] uncertainties" in favor of the view "more consistent with the Second Amendment's command." *Id.* In other words, and consistent with the rule of lenity, any possible tie on a Second Amendment challenge goes to the defendant.

> ### i.   § 922(g) is aimed at a general societal problem that has existed since the 18th century and must be "distinctly similar" to historical regulations

Courts faced with a *Bruen* challenge must identify the problem at which a statute is aimed, and then determine whether it existed in 1791 or instead grows out of "unprecedented," "unimaginable" societal changes. *Bruen,* 142 S. Ct. at 2132. Felons' (or at least criminals') access to firearms, at which § 922(g)(1) is directed, has posed a (potential) problem since well before 1791. "Felony" or "felon" were not well-defined terms in the founding era.[1] However, convicted criminals, and what punishments and collateral consequences those convicted criminals would face, was certainly a societal problem faced by the founders and our Nation. That "felon" was not yet a term used uniformly does not mean that convicted criminals access to arms was an "unimaginable" issue. Thus, the proper lens in which to analyze § 922(g)(1) is whether the more stringent standard of a "distinctly similar" regulation exists in our historical tradition rather than only a "relevantly similar" regulation.

---

[1] See Will Tress, Unintended Collateral Consequences: Defining Felony in the Early American Republic, 57 Clev. St. L. Rev. 461, 465 (2009) (citing 6 NATHAN DANE, DIGEST OF AMERICAN LAW 715 (Boston, Cummings, Hillard & Co. 1823) ("[T]he word *felony*, in the process of many centuries, has derived so many meanings from so many parts of the common law, and so many statutes in England, and has got to be used in such a vast number of different senses, that it is impossible to know precisely in what sense we are to understand this word").

When analyzing whether a modern regulation is "distinctly similar" to that of one in the founding era, the Court provided this guidance:

> [T]he lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstutionality.

*Id.* at 2131. The only historical regulation *Bruen* identified as sufficiently similar to New York's proper-cause requirement was an 1871 Texas law forbidding "anyone from 'carrying on or about his person . . . any pistol . . . unless he has reasonable grounds for fearing an unlawful attack on his person.'" *Id.* at 2153 (citing 1871 Tex. Gen. Laws § 1). This "reasonable grounds" requirement was essentially identical to New York courts' interpretation of that state's proper-cause standard, but the proper-cause standard was still found to be unconstitutional. *See Bruen*, 142 S. Ct. at 2123-24 & n.2. In a challenge to § 922(g)(1), therefore, a "distinctly similar" regulation would be one that either substantially abridged felons' right to keep and bear arms, or permanently denied firearms to some group very similar to felons (e.g., those convicted of some subset of especially serious crimes).

There is no historical tradition of disarming felons and certainly none permanently disarming criminals. Now-Justice Barrett performed a historical analysis on felon disarmament laws in a dissent during her time as a Judge and found no "founding-era laws explicitly imposing [ ] or explicitly authorizing the legislature to impose permanent felon disarmament laws." *Kanter,* 919 F.3d at 454. There are simply no founding-era or colonial bans on felons owning firearms. *See* Royce De R. Barondes, <u>The Odious Intellectual Company of Authority Restricting Second Amendment Rights to the "Virtuous"</u>, 25 Tex. Rev. Law & Pol. 245, 292 (2021) (finding

no analogous Founding-Era prohibitions against those with prior felony convictions nor state prohibitions "comparable to the current federal felon prohibition"). Our nation *does* have a history of "civil death" of some persons convicted of a crime, in which certain persons would forfeit all property, income, and titles, and could not serve as a witness. Rebecca McLennan, *When Felons Were Human*, https://nationalhumanitiescenter.org/on-the-human/2011/08/when-felons-were-human/#n9. This "civil death," however, was neither permanent nor did it apply to everyone convicted of a serious crime.[2] Even those who "had taken up arms against the state," would have their rights – the ability to serve on a jury, hold government office, vote, and ***own a firearm*** – restored, sometimes in as little as three years. *Id*; see also Saul Cornell & Nathan DeDino, <u>A Well Regulated Right: The Early American Origins of Gun Control</u>, 73 Fordham L. Rev. 487, 507-508 (2004).

In the founding era, if someone committed a firearms offense, the firearm was not taken away, but rather the person had to pay a surety to ensure good behavior, rather than give up their firearm. Greenlee, Joseph G.S., <u>The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms</u>, 20 Wyo. L. Rec. 249, 268 (2020). Indeed, our historical tradition is replete with evidence that criminals were able to carry arms - even those considered dangerous or who participated in armed insurrection were able to restore their right to bear arms. *Id* (discussing various examples of the lifting of firearm prohibitions, such as a 1776

---

[2] See, *id*:

> Following New York's lead in 1799, a full one-third of states enacted civil death statutes that provided that "a person sentenced for imprisonment for life is thereafter deemed civilly dead." Another seventeen eventually enacted variations. Unlike in English law, civil death was tied not to the fact of conviction but to the fact of imprisonment. In the courts' early interpretations, these statutes narrowed the breadth of civiliter mortus, both by reserving perpetual civil death only for that minority of persons serving life terms in a penitentiary and by restricting temporary civil death to imprisoned convicts, rather than imposing permanent civil death on all convicts, free or incarcerated. Before the 1820s, then, the prisoner's civil death ended upon his release from the penitentiary.

Massachusetts's law allowing disarmed citizens to regain the right after proving "friendliness to the liberal cause;" or a 1759 New Hampshire law that allowed sureties to ensure peace; or indeed, the rebels in Shay's rebellion who were allowed their firearms *after three years*). In all of these examples and in the majority of the arguments Government has made in previous cases, the law focused on "dangerousness" or "violence" rather than on criminals specifically, but even those considered "dangerous," "untrustworthy," or "unvirtuous," were eventually able to have their rights, to include their right to bear arms, restored.

The Government must support current regulations with a robust historical tradition of distinctly similar laws, but regarding the lifetime disarmament of "felons," they cannot. There is such a dearth of historical evidence regarding such laws, there is no daylight between the laws in the colonial era of our Nation and today.[3]

Indeed, § 922(g)(1) traces its origins not to our founding, but to 1938, when Congress passed a statute, the Federal Firearms Act, prohibiting certain felons from "receiving" firearms. *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (citing c. 850, § 2(f), 52 Stat.

---

[3] Greenlee points out the vast difference between disarmament laws around the time of our founding and the regulations in place now. He states:

> By comparison to the treasonous rebels who took up arms to overthrow the government in Shay's Rebellion and had their arms rights restored after three years, many nonviolent criminals today are prohibited forever from owning firearms. The contrast between Shay's rebels and present-day felons can be stark. For example, in West Virginia, someone who shoplifts three times in seven years, "regardless of the value of the merchandise," is forever prohibited from owning a firearm. In Utah, someone who twice operates a recording device in a movie theater is forever prohibited from possessing a firearm. And in Florida, a man committed a felony when he released a dozen heart-shaped balloons in a romantic gesture and thus earned a lifetime firearm prohibition. It is inconsistent with history for many nonviolent present-day felons – someone who shoplifts three packs of bubble gum in West Virginia – to receive a lifetime firearm prohibition, when prohibited persons in the founding era – including armed insurrectionists – regained their rights once they no longer posed a violent threat.

*Id*.

And in the Western District of Virginia, Mr. King, a man whose last felony for habitual motor vehicle violations was over 13 years ago, and whose last "serious" felony was almost 30 years ago, cannot "earn" back the right his fellow Americans are bestowed with by the Constitution of the United States.

1250, 1251 (1938)).  At that time, the statute "covered only a few violent offenses," *id.*, prohibiting firearm "receipt" by those convicted of crimes such as murder, rape, and kidnapping.  *United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011); *see also Range*, 96 F.4th at 104 (recognizing that original federal ban on felons possessing guns applied only to those convicted of a "'limited set of violent crimes such as murder, rape, kidnapping, and burglary'") (quoting *United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011)).  It was not until 1961 that Congress amended that statute to prohibit "receipt" "by all felons."  *Skoien*, 614 F.3d at 640 (citing Pub. L. 87-342, 75 Stat. 757) (noting that under the statute, "possession" was evidence of "receipt").  And it was not until 1968, that Congress formally "changed the 'receipt' element of the 1938 law to 'possession,' giving 18 U.S.C. § 922(g)(1) its current form."  *Id.*  Thus, the first firearm regulation in America broadly prohibiting all felons from possessing firearms was not enacted until almost two centuries after the Nation's founding, when the modern version of § 922(g)(1) became law.  *See Kanter*, 919 F.3d at 464 n.12 (Barrett, J., dissenting) ("[T]he first general prohibition on felon gun possession was not enacted until 1961 . . .."); *id.* at 462 ("[S]cholars have not identified eighteenth or nineteenth century laws depriving felons of the right to bear arms . . .."). A 1961 regulation or indeed even a 1938 regulation is not considered "longstanding" when assessing allowable limits of a constitutional right. *Range*, 69 F.4th at 104; see also, Allen Rostron, Justice Breyer's Triumph in the Third Battle over the Second Amendment, 80 Geo. Wash. L. Rev. 703, 731-32 (2012) ("Although Justice Scalia's opinion in Heller characterized disarming felons as a long-standing tradition, federal law did not disqualify any felons from possessing firearms until 1938 and did not disqualify nonviolent felons until 1961."). As *Bruen* makes clear, such "belated innovations . . . come too late to provide insight into the meaning of the Constitution in [1791]." 142 S. Ct. at 2137 (citing with approval the Chief Justice's dissent in *Sprint Communications Co. v. APCC Services,*

*Inc.*, 554 U.S. 269, 312 (2008)); *see also id.*at 2154 n.28 (declining to "address any of the 20th century historical evidence brought to bear by [the government] or their amici").

The "Founders themselves could have adopted" laws like § 922(g)(1) to "confront" the "perceived societal problem" of violence posed by felons possessing firearms.  *Bruen*, 142 S. Ct. at 2131.  But they declined to do so, and that inaction indicates § 922(g)(1) is unconstitutional.

      **ii.**      **Even assuming a "reasonably related" standard, the Government will fail to meet their burden in providing historical analogues**

As criminals and firearms were not an "unimaginable" problem at the time of the founding (as compared to, for example, fully automatic firearms), the appropriate analysis involves "distinctly similar" regulations, of which there are none. A growing body of law, however, has looked to whether there are "reasonably related" or somewhat analogous laws in our Nation's history, revolving mostly around the concept that our founders meant to arm only the "virtuous" or to disarm those who are "dangerous" or "violent." Even under this standard, which still begins with a presumption of unconstitutionality, §922(g)(1) does not pass constitutional muster.

As discussed above, there is some evidence that those who were considered "dangerous," "unvirtuous," or "violent" were sometimes disarmed (and never without the ability to regain their firearms unless sentenced to death or lifetime in a penitentiary) in our Nation's founding-era. See *Kanter v. Barr*, 919 F.3d 437, 456 (7th Cir. 2019) (Barrett, J., dissenting) ("The concern [ ] is not about felons in particular or even criminals in general; it is about threatened violence and the risk of public injury.") In other cases, the Government has argued that the laws focused on prohibiting the ownership of firearms among the "dangerous" are analogous to §922(g)(1). They are not.

17

In order to meet their burden under a "relevantly similar" standard, the Government must explain the "how" of the regulation and the "why" of each regulation, drawing analogies between §922(g)(1) and the historical traditions. See *Quailes*, 2023 U.S. Dist. LEXIS 147657 at *30 (citing *Bruen*, 142 S.Ct. at 2133). First, looking to the "how," the traditional laws of our Nation simply did not ban guns on a lifetime basis from felons or criminals. Founding-era and colonial-era laws ***temporarily*** unarming those citizens considered "dangerous" were never permanent status-based bans. *Range*, 69 F.4th at 105 ("Yet the Government's attempts to analogize those early laws to Range's situation fall short. That Founding-era governments punished some nonviolent crimes with death does not suggest that the particular (and distinct) punishment at issue – lifetime disarmament – is rooted in our Nation's history and tradition). The Court in *Range* found no statute that precluded those convicted from a crime from obtaining a firearm after they served their time. *Id*.

Section 922(g)(1) "bears little resemblance to laws in effect at the time the Second Amendment was ratified." *N.R.A. v. A.T.F.*, 700 F.3d 185, 196 (5th Cir. 2012). In 2007 a history professor at the University of Hartford undertook "a full survey of printed session laws pertaining to gun regulation in the thirteen colonies and Vermont between 1607 and 1815." Robert H. Churchill, Gun Regulation, the Police Power, and the Right to Keep Arms in Early America, 25 Law & Hist. Rev. 139, 143 & n.11 (2007). Based on that survey, Churchill concluded that "at no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic." *Id.* at 142. Carlton Larson, a professor at the University of California-Davis School of Law, has written that, "[a]s far as [he] can determine, state laws prohibiting felons from possessing

firearms or denying firearms licenses to felons date from the early part of the twentieth century." Carlton F.W. Larson, Four Exceptions in Search of a Theory, 60 Hastings L.J. 1371, 1376 (2009).

Other scholars agree. Although it is difficult "to prove a negative, one can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I." C. Kevin Marshall, Why Can't Martha Stewart Have A Gun?, 32 Harv. J. L. & Pub. Pol'y 695, 708 (2009). It appears New York became the first state to enact such a ban, when in 1917 it made a felony conviction a basis for revoking a concealed-weapon permit. *Id.* No other state passed a felon-disarmament law until 1923. *Id.*; *see also* Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009) ("Bans on ex-felons possessing firearms were first adopted in the 1920s and 1930s, almost a century and a half after the Founding."); Nelson Lund, The Second Amendment, Heller, and Originalist Jurisprudence, 56 UCLA L. Rev. 1343, 1357 (2009) (similar); Lawrence Rosenthal, The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control, 92 Wash. U. L. Rev. 1187, 1211 (2015) (similar).

In previous cases, the Government has also cited state ratifying conventions in Pennsylvania, Massachusetts, and New Hampshire to show that only "peaceable" citizens were allowed to own firearms. However, these ratifying conventions are distinguishable from actual historical analogues because they never became law. *Bullock*, 2023 WL 4232309 at *22–23. Additionally, three proposals in three states does not a historical tradition make. *Quailes*, 2023 U.S. Dist. LEXIS 147657 *29, Note 8 (citing *Bullock*, 2023 WL 4232309 at *22–23 and *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting)). In New Hampshire, the proposed bill regarding ownership of firearms would only disarm those engaged in armed conflict with the Government. 20 Wyo. L. Rev. at 266. Even assuming these proposals became laws, peaceable and law-abiding were not considered the same. *Id* ("Contemporaneous dictionary definitions show that peaceable

was better understood as nonviolent.") While there were laws in various states disarming those who posed a danger for various reasons (to include Catholics, slaves, and Indians), these laws did not permanently disarm citizens for perceived danger. *See id* at 268 ("So, once the perceived danger abated, the arms disability was often lifted.") *See also* 25 Tex. Rev. Law & Pol. at 296 ("So to be clear, there were Founding-Era provisions directly regulating firearms possession of persons considered physically dangerous, but they were not triggered automatically to impose a permanent ban on all persons who had ever committed any serious crime.") Assuming then, a "reasonably related" standard, and assuming the "how" of firearm regulation was banning dangerous people from owning firearms temporarily, §922(g)(1) fails as it is a lifetime ban on felons and has no nexus to dangerousness. Under this modern regulation, all felons regardless of when, how, or whether violence was involved in the underlying felony, are banned from owning firearms forever – so the "how" of the current regulation bears no resemblance to that of traditional firearm regulations.

However, even allowing *some* form of regulation of firearms for those considered dangerous comes with pitfalls. A dangerousness standard would turn every felon-in-possession case into a historical categorical approach. See *Bullock*, 2023 WL 4232309 at *27. The Second Amendment exceptions that this approach would produce are grossly overbroad.  Categories like "dangerous" and "disrespectful of the law" are anything but "well-defined."  *Bruen*, 142 S. Ct. at 2156.  Those labels are so malleable that, in the wrong hands, they could be applied to virtually any group of people—and thereby "eviscerate" the right to keep and bear arms.  *Id.* at 2134; *see Medina v. Whitaker*, 913 F.3d 152, 159-60 (D.C. Cir. 2019) (concluding "'dangerousness' standard" is too "amorphous . . . to delineate the scope of the Second Amendment"); *Kanter*, 919 F.3d at 465 (Barrett, J., dissenting) ("The government could quickly swallow the [Second

Amendment] right if it had broad power to designate any group as dangerous and thereby disqualify its members from having a gun."). These terms not only lack a "clear limiting principle," they lack any limiting principle at all. *United States v. Alvarez*, 567 U.S. 709, 723 (2012) (declining to carve out broad new category of speech unprotected by the First Amendment) (emphasis added); *see also Bruen*, 142 S. Ct. at 2130 (analogizing Second Amendment to First Amendment).

Given all of these issues, the Court need never even look to the "why" of historical regulations and § 922(g)(1). However, if it does, the "why" of § 922(g)(1) and traditional disarmament laws are completely at odds.

> The Fifth Circuit's recent decision in United States v. Rahimi, however, rejected analogies to historical laws disarming "dangerous" people, because the "why" of those laws was different than the "why" of modern laws. 61 F.4th at 457. It concluded that Founding-era Americans disarmed people to preserve "political and social order," rather than protect potential victims from the threat of crime. *Id.*

*Bullock,* 2023 WL 4232309 at *66. If one combs through historical analogues, this is correct. Professor Barondes, in his article, discusses the three main categorical ***state*** restrictions at the time of the Founding that are the most comparable to § 922(g), all dealt with; 1) "persons who refused to swear an oath of allegiance to the state or to the nation," 2) targeting "slaves, free blacks, and Loyalists," or others who posed danger *immediately after the Revolutionary War*; and 3) dangerous people who needed to post bonds. 25 Tex. Rev. Law & Pol. at 292-93. He accurately points out that the first two classes of regulations, got to a different "why" of § 922(g), "Lack of loyalty to one's government, and adhering to governments in opposition, in temporal proximity to the American Revolution is qualitatively different from permanently disarming all persons who had previously committed any serious crimes." *Id*. Even in the third category of regulations, however, where the "why" was *arguably* was to protect against those

who were dangerous, they typically only applied to crimes of violence, and as discussed above, allowed for a reinstatement of rights upon posting of a bond (even in "the seminal case addressing the seventeenth-century treatment of one who "with evil intent," traveled with arms to terrify the people.") *Id* at 296-97. Not only does § 922(g)(1) fail to track with the "how" of historical regulations by banning felons permanently from firearms, it fails to track with the "why" as it does not bear on dangerousness at all. If it did, only violent felonies or those at risk of endangering others would be prohibited from owning guns and once perceived dangerousness was diminished, the rights of such a person would be restored.[4]

Thus, even under a "relevantly similar" standard, § 922(g)(1) is inconsistent with the Nation's historical tradition of firearm regulation and fails Mr. King's constitutional challenge.

c.   *As applied, to Mr. King, § 922(g)(1) is unconstitutional*

Applying the foregoing analyses to the facts of this case, § 922(g)(1) is also unconstitutional as applied to Mr. King. As discussed above, Mr. King is one of "the people" that the Second Amendment demands must be allowed to bear arms. *See, e.g.*, *Range*, 2023 WL 3833404, at *6 (rejecting government's argument "'legislatures traditionally used status-based

---

[4] To the extent an argument exists that 922(g)(1) attempts to protect against gun violence (see H*uddleston v. United States*, 415 U.S. 814 (1974)), it is not working. Gun crime has not gone down, and the law over-incarcerates individuals who are not violent nor considered dangerous and are overwhelmingly people of color. Although focused on Illinois, scholar David Olson describes the conflation of gun violence and "illegal" gun possession:

> In other words, as a result of these legislative changes, everyone who is arrested and convicted of illegally carrying a handgun in Illinois – primarily young, Black men in Chicago – is viewed as so dangerous that prison is seen as the only appropriate sentencing response. For those with felony convictions, it does not matter what the prior felony was for, how long ago the felony conviction occurred, or if the prior felony conviction indicated any propensity for violence. Among those convicted as a felon in possession of a firearm, the majority – 74% - did not have any prior conviction for a violent felony offense. Rather, most were "felons" as a result of a prior conviction for drug-law violations, property crimes, or a prior illegal firearm possession offense.

David Olson, *Illegal Firearm Possession: A Reflection on Policies and Practices that May Miss the Mark and Exacerbate Racial Disparity in the Justice System*, Duke Center for Firearms Law, Jan. 19, 2022, https://firearmslaw.duke.edu/2022/01/illegal-firearm-possession-a-reflection-on-policies-and-practices-that-may-miss-the-mark-and-exacerbate-racial-disparity-in-the-justice-system/

restrictions' to disarm certain groups of people", and that "[a]part from the fact that those restrictions based on race and religion now would be unconstitutional under the First and Fourteenth Amendments, the Government does not successfully analogize those groups to Range and his individual circumstances"). The Second Amendment presumptively protects his conduct in keeping guns in his home. Even if the Court finds that there is a historical regulation distinctly similar to disarming felons or criminals, those regulations allowed for a restoration of rights. Mr. King's civic rights have been restored. The right to keep and bear arms under the Second Amendment is not a "civic right," like the right to vote or hold political office. It is a "fundamental right" grounded in one's "inherent right to self-defense." *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010). Of the civic rights restored to Mr. King, only the right to vote is considered "fundamental," in the same class as the right to bear arms. *See Binderup v. Attorney Gen. United States of Am.*, 836 F.3d 336, 369 n.14 (3d Cir. 2016) (Hardiman, J., concurring) (the right to run for public office and the right to serve on a jury "are not fundamental rights"). Allowing Mr. King the restoration of his civic rights, including his fundamental right to vote, but not his fundamental right to bear arms, turns the Second Amendment into a second-class right, in contradiction of the edict in *McDonald* and *Bruen*.

Even if the Court finds that § 922(g)(1) is constitutional because it is "relevantly similar" to laws that temporarily deprived those who were "dangerous" of firearms, then disarming Mr. King is still unconstitutional. Mr. King is a 60-year-old man, who has a handful of felonies in his past life. One is a 2009 conviction for "habitual offense" of traffic laws; the other two are almost 30-year-old property crimes not involving firearms, one of which he plead no contest and the other in which he signed an Alford plea. As scholars of gun laws have posited, "[I]t is difficult to see the justification for disarming a 60 year old who was convicted of a crime of violence at age

20, and was not punished capitally or with life in prison (classes that present no issue for an arms disability), but was instead was released at age 40, and has stayed clean for 20 years." C. Kevin Marshall, Why Can't Martha Stewart Have A Gun?, 32 Harv. J.L. & Pub. Pol'y 695, 735 (2009). Here, Mr. King was not convicted of a crime of violence, was not in prison for 20 years, and since the age of 32 has stayed clean (save for traffic violations not related to violence or firearms at all) for 28 years. He is now in jail and facing a long-term prison sentence because 28 years after his convictions for robbery, 3-years after his civic rights (and fundamental right of voting) were restored, he cannot exercise a right that the Founders considered so fundamental, they restored to those who acted in armed rebellion against the Government. § 922(g)(1) as applied to Mr. King shreds his constitutional rights.

While it is Defense's contention that Mr. King need not prove he is peaceable – even assuming § 922(g)(1) has a historical analogue – that is not the requirement nor burden that *Bruen* requires - it is not just Mr. King and his counsel who believe he is not violent or non-dangerous. Government agents believe it too. As the ATF arresting officers said throughout their transport of Mr. King – he is not the guy they are worried about.  They know he is not dangerous, but they're worried about other people. "You might not be a bad guy, you said you're a guy who just liked guns, but those guns, if you're not out there potentially could get in the hands of someone who is a bad guy and that's our concern." Exhibit 2 at 13:37. They say again and again – Mr. King is not dangerous – "As a good a guy as you are, if it can get in your hands, it can get in somebody legitimately bad hands [sic]. And that's our concern," and Mr. King is not violent – "Primarily what we deal with and what we try to help out with the most is violent crimes, and I don't think you're that…you are not the violent guy." Exhibit 2 at 43:13 and 1:28:21 respectively. Mr. King is a long way from those in Shay's Rebellion who got their

firearms back or those who travelled with "evil intent" to "terrify" the people whose firearms could be restored to them. As ATF said, he's a good guy who allegedly owned firearms. He is a United States citizen who can vote but cannot exercise his Second Amendment right to arm and protect himself from those very same dangerous people that ATF is so worried about. § 922(g)(1) as applied to Mr. King is unconstitutional and Count One must be dismissed.

## II.     18 U.S.C. § 842(i) and 844(a) also fail to survive such Constitutional scrutiny

### a.    Blasting caps are firearms and thus regulation of such must undergo the same *Bruen* test as any other firearm

The blasting caps should be considered firearms. 18 U.S.C. § 921(a)(3) describes a firearm in part as "any destructive device." 18 U.S.C. § 921(4) describes "destructive device" as "any explosive." It's in the name - "electric explosive detonators" are explosives.  Explosives are destructive devices. Destructive devices are firearms. Thus, a blasting cap is a firearm, and therefore ownership of such is protected under the Second Amendment. Blasting caps are used to detonate an explosive charge and contain a smaller explosive charge which can then be used to set off a larger, attached explosive.  This makes them much more akin to the firearms used in our Nation's founding-era than other modern-day firearms. The most apt analogy would be between blasting caps and the percussion cap used to fire a musket. In both, the blasting cap (or percussion cap) is used as an initial charge to facilitate a larger explosive action. As such, on their own each mechanism holds little value or inherent danger without accompanying equipment to engage the larger explosive action. If the protections envisaged by the Founders apply to modern-day handguns, pistols, and rifles, it is obvious they then apply to a mechanism substantially similar to the same one used in Founding-era weaponry such as the musket.

While Mr. King was charged under 18 U.S.C. § 842(i), which by nature of being a wholly separate criminal regulation from 18 U.S.C. § 922(g), contains different definitions, what

he owned are still legally defined as firearms, and therefore protected under the Second

Amendment for all the reasons discussed in the first section of this analysis.

### b. If not considered firearms, then Mr. King's restoration of rights meant that he was specifically able to own such a device

The Government has an issue separate from the Second Amendment, in that if blasting

caps are not considered firearms covered by the Amendment, then it is legal for Mr. King to own

them. On December 26, 2019, the Commonwealth of Virginia restored Mr. King's rights, stating

specifically that the Governor "hereby remove[s] the political disabilities, except the ability to

ship, transport, possess or receive firearms." There is no exception for destructive devices. His

rights are restored **except** for those relating to firearms. If blasting caps are not firearms, as of

December 26, 2019, he was legally allowed to do what any other citizen can do. Or at least, Mr.

King had every reason to believe that he was no longer prohibited from owning such explosives

as he was unaware of his prohibited status due to the letter from the commonwealth.

While 18 U.S.C. § 845(b) clarifies that one may only be exempted from the dictates of 18

U.S.C. §842(i) with an application to the Attorney General, 18 U.S.C. §842(i) itself does not

clarify this. It is only illegal to own such material if one has been convicted of a crime with a

sentence of imprisonment for a term of a year or more. This is a status offense. The order from

the Commonwealth specifically tells Mr. King he has "rejoined free society." A defendant

"generally must 'know the facts that make his conduct fit the definition of the offense'… even if

he does not know that those facts give rise to a crime." *Elonis v. United States*, 55 U.S. 723, 735

(2015) (quoting *Staples v. United States*, 511 U.S. 600, 607, n.3 (1994)). Thus, assuming Mr.

King did possess the blasting caps, the Government will need to not only show that he indeed

knew he possessed blasting caps, but also that he knew he was a convicted person under the

statute. While certainly Mr. King knew he had been convicted of a felony, given the

Commonwealth's letter it is fair to say he did not know he was still considered "a felon," or someone whom the prohibitions that only apply to specific people apply. Without the knowledge of the facts making his conduct illegal, he should not be held liable for those actions.[5]

### III.   26 U.S.C. § 5841, 5861(d), and 5871 are unconstitutional as applied to Mr. King because it was impossible for him to comply with the law

26 U.S.C. § 5841 requires registration of firearms and 26 U.S.C. §5861(d) makes it unlawful "to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." Mr. King allegedly owned guns, which were only prohibited by nature of his status as a "felon," which as argued above is unconstitutional. Due to this unconstitutional barrier to Mr. King's constitutionally guaranteed right, he was unable to register his firearm. If not for the unconstitutional barrier, he would have been able to register his firearm. In order to comply with 26 U.S.C. § 5841, Mr. King would have to self-incriminate by admitting to a violation of 18 U.S.C. §922(g). Ordinarily this would not violate a person's rights because no person is required to take possession of an unregistered firearm. *See, e.g., Robbins v. United States*, 476 F.2d 26 (10th Cir. 1973); *United States v. Jones*, 976 F. 2d 176, 183 (4th Cir. 1992); *but see United States v. Dalton*, 960 F.2d 121 (10th Cir. 1992).

However, unlike in *Jones*, where the Court found that the Appellant (a machine gun dealer) could have complied with both the National Firearms Act and the Gun Control Act by simply refusing to deal in machine guns and thus, the Act did not violate his right to due process, this act, paired with the unconstitutional prohibition of Mr. King's Second Amendment right provided Mr. King no choice. *Jones*, 976 F. 2d at 183. Mr. King would have had to choose to not

---

[5] Defense Counsel believes there is very good evidence that Mr. King had no idea he actually owned blasting caps, and therefore cannot be held liable, but that is an argument for the fact finder.

exercise a fundamental right to avoid breaking the law, a due process Catch-22. Therefore, 26

U.S.C. § 5841 and related statutes are unconstitutional as applied to Mr. King.

## EXHIBITS

The Defense respectfully submits the following exhibits in support of its motion:

Exhibit 1:  Grand Jury Transcript of ATF Agent James Smith

Exhibit 2:  ROI No. 6.

Exhibit 3:  Interrogation/Transport Audio

Exhibit 4:  Mr. King's Restoration of Rights by the Commonwealth of Virginia

## CONCLUSION

As set forth above, Mr. King, respectfully requests, through counsel, that the Court

dismiss the entirety of the indictment in this case as the prosecution violates his Second

Amendment right to keep and bear arms.


Respectfully submitted,

                                        ROBERT LEON KING

                              By:  _Beatrice Diehl_
                                        Beatrice F. Diehl
                                        Fl. Bar No. 0124667
                                        Counsel for Defendant
                                        Office of the Federal Public Defender
                                        For the Western District of Virginia
                                        210 First Street, SW, Suite 400
                                        Roanoke, VA 24011
                                        Ph. (540) 777-0891

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document was electronically filed and

will be forwarded to the Office of the United States Attorney this 8th day of December, 2023.

*Beatrice Diehl*