**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 7:23cr00034** |
| | : | |
| **ROBERT LEON KING** | : | |

### GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S AMENDED MOTION TO DISMISS THE INDICTMENT

The United States opposes the amended motion to dismiss the indictment filed by defendant Robert Leon King (ECF No. 39). In his motion, King urges the court to dismiss the indictment against him, claiming that the felon-in-possession statute, 18 U.S.C. § 922(g), is unconstitutional. This same argument has been considered and rejected by two circuit courts[1] and more than 120 district courts across the nation, including those within the Western District of Virginia. This court, too, should reject King's attack on § 922(g)(1). The Second Amendment right is "not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626, 628–29 (2008). Its text, as interpreted by *Heller* and its progeny, explains that the right of armed self-defense extends only to "law-abiding citizens," not felons. Thus, Congress may properly disarm those who are not law-abiding, responsible citizens.

The history of the right to keep and bear arms—before, during, and after the Founding Era—further confirms that legislatures can disarm felons. English law allowed the government to disarm individuals who were "dangerous" or not "peaceable." Second

---

[1] *See United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023) (rejecting as-applied challenge because, consistent with *Bruen*, Congress had constitutional authority to disarm all felons); *Vincent v. Garland*, 80 F.4th 1197, 1200–02 (10th Cir. 2023).

Amendment precursors proposed during the Founding Era guaranteed the right to keep and bear arms only to "honest and lawful" citizens or those who posed no "danger of public injury." And commentators in the 19th century recognized the government's authority to disarm individuals who were not "orderly," "peaceable," or "well-disposed."

Tradition further confirms that reading of the Second Amendment. American legislatures have long disarmed individuals whom they have found to be dangerous, irresponsible, or otherwise unfit to possess arms. Although different statutes disqualified different groups at different times, they reflect the same enduring principle: Legislatures may disarm those who are not law-abiding, responsible citizens.

Section 922(g)(1) passes constitutional muster, both on its face and as applied to King. King's arguments as to 26 U.S.C. §§ 5841, 5861(d), and 5871 and § 842(i). As such, the court should deny the motion to dismiss.

## FACTUAL BACKGROUND

On April 18, 2023, the Giles County Sheriff's Office, as a part of a narcotics investigation, conducted a controlled purchase from an individual named Ethan Jude using a confidential informant (CI). As a part of that controlled purchase, Jude told the CI that he had to go pick up narcotics from another location. He brought the CI to a property located at 1006 Cascade Drive, entered the property, came back out, and sold narcotics to the CI. Using this information, the Sheriff's Office sought a search warrant for 1006 Cascade Drive and executed it the same day.

At the time the warrant was executed, there were six adults located at the residence, including King and a woman thought at the time to be his girlfriend, Tanya Vaught Martin.

In the course of executing this warrant, law enforcement found narcotics but also saw, in plain view, firearms, ammunition, and explosive devices. Because they were aware that King was a felon, law enforcement sought and received a second warrant to search the property for additional evidence, including firearms. That warrant was immediately executed, and the Sheriff's Office ultimately seized multiple guns, ammunition, and four blasting caps that are of a type used in commercial demolition and mining operations to trigger large explosions.

Law enforcement found the blasting caps, the ammunition, and three firearms—including a sawed-off shotgun with a stock that had been manually cut down and a barrel held on with black electrical tape—in the bedroom that King and Ms. Martin occupied. These items were found inside a concealed area inside of a stool. Ms. Martin told law enforcement that there were firearms located there. A fourth firearm was found just outside the bedroom window. Ms. Martin told law enforcement that King had tossed the firearm out the window when he saw the police arrive. During post-*Miranda* questioning, King claimed ownership of the explosives and also said the guns were his but that he was keeping them for someone else. He later made statements about the firearms to law enforcement officers while being transported, including the fact that he likes guns and had a need to be prepared because he feared that someone might try to rob him sooner or later.

On July 20, 2023, a federal grand jury returned a three-count Indictment charging King with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1); unlawfully possessing a sawed-off shotgun, in violation of 26 U.S.C. § 5861(d); and for being a felon in possession of explosives, in violation of 18 U.S.C. § 842(i). Indictment, ECF No. 1. King now moves to dismiss the charges against him.

## LEGAL FRAMEWORK

The Second Amendment of the United States Constitution reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In *District of Columbia v. Heller*, the Supreme Court recognized in the Second Amendment an individual right to "possess and carry weapons in case of confrontation." 554 U.S. 570, 577–93, 628–29 (2008). Applying that right, the Court struck down a D.C. statute that banned handgun possession. *Id.* at 635.

The *Heller* Court took pains to emphasize that the right secured by the Second Amendment was "not unlimited." *Id.* at 626. At three points, the *Heller* opinion emphasized the continued constitutionality of laws prohibiting, among other things, the possession of firearms by felons. *See id.* at 626–27 & n.2; *id.* at 636. Indeed, such restrictions were "presumptively lawful." *Id.* at 627 n.2.

The Supreme Court revisited *Heller* two years later in *McDonald v. City of Chicago*, 561 U.S. 742 (2010). Reviewing a Chicago handgun possession ban similar to the one at issue in *Heller*, a majority of the *McDonald* Court explained that the Second Amendment is incorporated to the states via the Fourteenth Amendment. *Id.* at 750. In a portion of the opinion adopted by a plurality[2] of the Court, Justice Alito "repeat[ed] . . . assurances" that "[its] holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons . . . .'" *Id.* at 786.

---

[2] Justice Thomas—who joined the *Heller* majority—did not join this part of the opinion because of his long-held view that the Privileges or Immunities Clause of the Fourteenth Amendment, and not the Due Process Clause, was the "more straightforward path" to incorporation. *McDonald*, 561 U.S. at 805–06 (Thomas, J., concurring in part and concurring in the judgment).

Finally, in *New York State Rifle & Pistol Association v. Bruen*, the Supreme Court analyzed a "may-issue" permitting regime in New York that required concealed-carry permit applicants to demonstrate a special need for the permit. *See* 142 S. Ct. at 2122, 2156. Justice Thomas, writing for the Court, clarified *Heller*'s legal standard. He noted that the Courts of Appeal had, post-*Heller*, adopted a two-part test for analyzing Second Amendment challenges. *Id.* at 2125. In the first step, courts considered challenged laws relative to the historical meaning of the Second Amendment, and next considered whether a "core" Second Amendment right had been burdened. *Id.* at 2126. If so, strict scrutiny applied; if not, courts applied intermediate scrutiny. *Id.*

The *Bruen* Court affirmed the propriety of the history-based first step but declined to adopt the use of means-end scrutiny. *Id.* at 2127. Rather, *Heller* instructed that courts should look to text, history, and tradition: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* at 2130.

To assess whether a challenged regulation is consistent with the history and tradition of the Second Amendment, courts must apply "reasoning by analogy," which requires "a determination of whether the two regulations are 'relevantly similar.'" *Id.* at 2132 (quoting Cass Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 733 (1993)). Such reasoning is neither a "regulatory straightjacket nor a regulatory blank check," and requires "only that the

government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2133 (emphasis in original).

Applying this historical test, the Court invalidated New York's "may-issue" licensing regime, concluding that such discretionary restrictions on law-abiding citizens' ability to carry firearms were inconsistent with the historical record. *Id.* at 2156. But both the majority and the concurrence stressed that "shall-issue" licensing regimes, which subject potential licensees to a background check, remain constitutional and appropriate. *Id.* at 2138 n.9 (explaining that shall-issue regimes are constitutional because "it appears that these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'"); *see also id.* at 2161-62 (Kavanaugh, J., concurring).

## ARGUMENT

King raises both facial and as-applied challenges to § 922(g)(1). Each of these challenges must fail. Section 922(g)(1) passes muster on its face under *Bruen* for two reasons. First, the text of the Second Amendment, as construed by *Heller* and its progeny, makes clear that the right of armed self-defense extends only to "law-abiding citizens," not to convicted felons. Second, the felon-in-possession restriction at issue is consistent with the historical tradition of firearms ownership in the United States. Additionally, § 922(g)(1) is constitutional as applied to King, a three-time convicted felony with a history of robbery and breaking and entering and multiple felony probation violations.

6

### a.  Section 922(g)(1) Is Facially Constitutional Under *Bruen*

King claims that § 922(g)(1) is unconstitutional on its face after *Bruen*. Judges within the Western District of Virginia to have considered this argument have rejected it. *See United States v. Ferguson*, No. 7:23-cr-00033, ECF No. 35 (W.D. Va. Jan. 2, 2024) (Cullen, J.); *United States v. Espinosa*, No. 5:23-cr-00006, ECF No. 58 (W.D. Va. June 5, 2023) (Cullen, J.); *United States v. Robinson-Davis*, No. 7:22-cr-00045, ECF No. 40 (W.D. Va. Mar. 14, 2023) (Cullen, J.); *United States v. Overstreet*, No. 7:23-cr-00001, ECF No. 37 (W.D. Va. Oct. 30, 2023) (Dillon, J.); *United States v. Wagoner*, No. 4:20-cr-00018, 2022 WL 17418000, at *4-5 (W.D. Va. Dec. 5, 2022) (Dillon, J.).  The court should reach the same conclusion here. Constitutional text—elucidated by *Heller* and *Bruen*—makes clear that the Second Amendment's protections do not extend to King's conduct. And even if they do, § 922(g)(1) is squarely "consistent with the Nation's historical tradition" of disarming persons deemed by legislatures not to be law-abiding, responsible persons.

### i.  The Text of the Second Amendment Confirms That Only Law-Abiding Citizens May Claim a Right to Armed Self-Defense

*Bruen* instructs that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2126. But the scope of the Second Amendment, as defined in *Heller*, *McDonald*, and *Bruen*, is "not unlimited." *Id.* at 2128 (quoting *Heller*, 554 U.S. at 626). As those cases make clear, "the people" protected by the Second Amendment are not *all persons* in the United States, but rather all "law-abiding citizens." *Heller*, 554 U.S. at 625, 635. As such, King—a convicted felon with a history of probation violations who possessed multiple firearms at his residence, including a sawed-off shotgun—cannot claim the protections of the Second Amendment.

1. *Heller* and *Bruen* Defined "the People" in a Manner That Excluded Felons

*Heller* interpreted the Second Amendment to codify a pre-existing individual right to bear arms, vested in "the people." *See* 554 U.S. at 579–81, 592. But the *Heller* Court defined "the people" narrowly,[3] describing the term as referring to "all members of the political community, not an unspecified subset." *Id.* at 580. That reference to "political community" carried significant import. As Thomas Cooley explained in his "massively popular 1868 Treatise on Constitutional Limitations," *id.* at 616, "the *people* in whom is vested the sovereignty of the State . . . cannot include the whole population," and "[c]ertain classes have been almost universally excluded"—including "the idiot, the lunatic, and the felon, on obvious grounds." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28–29 (1868). To use more modern terms, felons are not members of the political community because they are stripped of political rights, such as the right to vote, to hold public office, and to serve on a jury. *See id.*

*Bruen* maintained *Heller*'s definition of "the people." *See* 142 S. Ct. at 2126, 2129, 2131 ("reiterat[ing]" *Heller*'s approach, clarifying the legal standard "[i]n keeping with *Heller*," and "apply[ing] the "test that [the Court] set forth in *Heller*."). Like *Heller*, *Bruen* limits the scope of Second Amendment rights to "law-abiding citizens," repeating that phrase 14 times. *Bruen*, 142 S. Ct. at 2122, 2125, 2131, 2133–34, 2135 n.8, 2138 & n.9, 2150, 2156.

---

[3] Justice Stevens, writing for the dissenting justices in *Heller*, read the majority decision the same way, and accused the majority of defining "the people" protected by the Second Amendment more narrowly than in other constitutional contexts. *See id.* at 644 (Stevens, J., dissenting). King's arguments echo Justice Stevens's—but those arguments were in dissent, not the majority opinion.

In addition to using *Heller*'s "law-abiding citizens" language, *Bruen* also explicitly approved of "shall-issue" concealed carry laws, which require applicants to undergo background checks and fingerprinting. As the *Bruen* Court noted, such laws generally pass constitutional muster because they are "designed to ensure only that those bearing arms . . . are in fact 'law-abiding, responsible citizens.'" *Id.* at 2138 n.9; *see also id.* at 2161–62 (Kavanaugh, J., concurring and block-quoting *Heller*'s language about the "presumptively lawful" "prohibitions on the possession of firearms by felons"). King is silent about this portion of *Bruen*, which directly contradicts his position. Put simply, there cannot be a constitutional right for a felon to carry a firearm if it is constitutionally permissible to ensure that firearms carriers do not have felony records.

Recognizing his predicament, King urges the court to disregard the Supreme Court's discussion of "law-abiding citizens" and "presumptively lawful" felon-dispossession laws as mere dicta. But federal courts "cannot ignore the Supreme Court's explicit guidance simply by labeling it 'dicta.'" *Hengle v. Treppa*, 19 F.4th 324, 346 (4th Cir. 2021). As the en banc Fourth Circuit has explained: "[W]e routinely afford substantial, if not controlling deference to dicta from the Supreme Court. Respect for the rule of law demands nothing less: lower courts grappling with complex legal questions of first impression must give due weight to guidance from the Supreme Court, so as to ensure the consistent and uniform development and application of the law." *Manning v. Caldwell*, 930 F.3d 264, 281–82 (4th Cir. 2019) (en banc).

King also cites *Maryland Shall Issue, Inc. v. Moore*, 2023 WL 8043827 (4th Cir. Nov. 21, 2023) to suggest the Court may ignore an "outcome hinted at in dicta" where text, history,

and tradition point to a different answer. But the language that King would have the court ignore was not a one-off comment, a hinted-at "outcome," or a brief, unsupported aside. It was key language that was repeated numerous times in *Heller*, again in *McDonald*, and again in *Bruen*. In all, eight members of the Supreme Court have now explicitly approved of felon-dispossession statutes.[4] *See Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring); *id.* at 2189 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting); *N.Y. State Rifle & Pistol Ass'n v. City of New York*, 140 S. Ct. 1525, 1540–41 (2020) (Alito, J., joined by Thomas and Gorsuch, JJ., dissenting).

> 2. Binding Fourth Circuit Case Law Adopts This Interpretation of the Second Amendment's Text

The Fourth Circuit has also adopted the same "law-abiding, responsible citizen" language from *Heller* that King urges the court to discard. And while the cases on point predate *Bruen*, they were not abrogated by *Bruen* because they did not rely on means-end scrutiny. As a result, this court remains bound by the Fourth Circuit's interpretation of "the people."

In *United States v. Moore*, 666 F.3d 313, 319 (4th Cir. 2012), the court rejected a felon's facial and as-applied challenges to § 922(g)(1). In the as-applied portion of its analysis, the court explained: "Moore simply does not fall within the category of citizens to which the *Heller* Court ascribed the Second Amendment protection of 'the right of *law-abiding responsible citizens* to use arms in defense of hearth and home.'" *Id.* (emphasis in original) (quoting *Heller*, 553 U.S. at 635). And the court described Moore's criminal history as placing him

---

[4] Justice Barrett has not expressly indicated her stance while serving on the Supreme Court. On the Seventh Circuit, however, Justice Barrett argued that 18 U.S.C. § 922(g)(1) was unconstitutional as applied to a nonviolent offender convicted of mail fraud. *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting).

"plainly outside the scope of the Second Amendment." *Id.* at 320; *see also United States v. Carpio-Leon*, 701 F.3d 974, 979 (4th Cir. 2012) (rejecting challenge to § 922(g)(5) without proceeding to the second, means-end scrutiny analytical step and explaining "[I]llegal aliens do not belong to the class of law-abiding members of the political community to whom the Second Amendment gives protection.").

Similarly, in *United States v. Pruess*, 703 F.3d 242 (4th Cir. 2012), the Fourth Circuit followed *Moore* in rejecting an as-applied challenge by a non-violent felon. *See id.* at 244–47. Applying *Heller*'s "presumptively lawful" standard, the *Pruess* court concluded that a nonviolent felon's conduct "lies outside the scope of the Second Amendment's protection." *Id.* at 246.

Critically, these cases remain good law post-*Bruen. See Vincent v. Garland*, 80 F.4th 1197, 1200–02 (10th Cir. 2023) (applying similar Tenth Circuit precedent after concluding that it was not abrogated by *Bruen*). *Moore* rejected a facial challenge to § 922(g)(1) without relying on means-end scrutiny. Instead, *Moore* relied on *Heller*'s language about the propriety of felon-dispossession laws and (in its as-applied analysis) emphasized that the Second Amendment protects the rights of "law-abiding responsible citizens[.]" *Id.* at 319–20. And while *Bruen* overruled courts' reliance on means-end scrutiny, it clearly did not overrule *Heller*, much less the Fourth Circuit's (and other courts') reliance on *Heller* to delimit the scope of the Second Amendment right to "law-abiding citizens," or uphold the proscription of felons' possession of firearms. As a result, King's motion necessarily fails; it is inconsistent with *Heller* and runs afoul of binding, still-applicable precedent from the Fourth Circuit. Judge Cullen recently reached exactly this conclusion in *United States v. Ferguson*, 7:23-

cr-00033, ECF No. 35 (W.D. Va. Jan. 2, 2024) (Cullen, J.) (relying on reasoning in *United States v. Robinson-Davis*, in which the court found *Moore* and *Pruess* remain good law and require denial of defendant's motion). The court should find the same here.

### 3.   King's Arguments to the Contrary Are Unpersuasive

King's primary argument (aside from suggesting the Court should ignore binding Fourth Circuit precedent or repeated admonitions from the Supreme Court) is his notion that he *is* part of the "national, political community," notwithstanding his many criminal violations. In essence, he argues that *Heller* relied on the Fourth Amendment and spoke broadly about the meaning of "the people"; and that excluding felons would make the Second Amendment a second-class right. Neither arguments makes logical sense.

For example, the term "people" need not bear precisely the same meaning in the Second Amendment that it does in the First and Fourth Amendments. Those latter provisions undisputedly protect even those who have been excluded from "the political community" because of felony convictions. *Heller*, 554 U.S. at 580. But *Heller* indicates that even those who are protected by other provisions of the Bill of Rights—including "felons and the mentally ill," *id.* at 626—nevertheless can be disarmed consistent with the Second Amendment. In effect, the scope of the "people" *cannot* be the same in both contexts under *Heller*—a result leading to the commonsense conclusion that there may be different rules or considerations in different constitutional contexts. It's one thing to say a potentially or historically dangerous person can still engage in political speech and be free from unreasonable, unwarranted searches and seizures; it's quite another to say they must be allowed to carry a gun.

Moreover, excluding felons from gun ownership or possession does not make the *right* "second-class"; it simply limits the privileges of the right to those allowed to enjoy them, in a way that protects the public at large. Indeed, when Supreme Court justices (and others) complained that certain decisions render the Second Amendment a second-class right, it was not because those decisions meant *not enough people* were allowed to enjoy the Amendment's right; rather, it was because the law-abiding people entitled to its benefits had the *scope of their privileges* circumscribed. *See, e.g., Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039 (2015) (Thomas, J., dissenting from denial of certiorari); *cf. McDonald*, 561 U.S. at 780 (suggesting the Second Amendment would be relegated to a second-class right were it not incorporated into the Bill or Rights)

King also briefly references the Fifth Circuit's decision in *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023), *cert. granted*, 143 S. Ct. 2688 (2023)[5], which struck down the law prohibiting individuals subject to domestic violence restraining orders from possessing firearms, 18 U.S.C. § 922(g)(9), *id.* at 448. King relies on *Rahimi* primarily to suggest the Court should ignore the Supreme Court's repeated "dicta" about felon-disarmament laws—a suggestion that, as explained above, is wholly inconsistent with binding Fourth Circuit precedent and with courts' general duty to abide by clear statements, even if dicta, from the Supreme Court. But to the extent King also seeks to rely on the *Rahimi* court's criticism of the idea that "law-abiding" status could be used to limit constitutional rights, *see id.* at 451–53, that reliance would be misplaced.  *Rahimi* is unpersuasive and wrong, and this Court should decline to adopt its faulty paradigm.

---

[5] The Supreme Court heard argument in *Rahimi* last November. A decision is expected by June 2024.

For one thing, individuals can and do waive or forfeit constitutional rights by their conduct. *See Peretz v. United States*, 501 U.S. 923, 936–37 (1991) (explaining that "[t]he most basic rights of criminal defendants are . . . subject to waiver"); *see also, e.g.*, *United States v. Jackson*, 706 F.3d 264, 268 (4th Cir. 2013) (discussing the "forfeiture by wrongdoing" exception to the Confrontation Clause). An individual's decisions to commit criminal acts may have ramifications for the rights and privileges that he or she later enjoys under the law, and those restrictions have been broadly upheld.

The Supreme Court has repeatedly, even routinely, upheld status-based restrictions on constitutional rights. For example, students have limited First and Fourth Amendment rights. *See, e.g.*, *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988) (permitting educators to "exercis[e] editorial control over the style and content of student speech in school-sponsored expressive activities"); *New Jersey v. T.L.O.*, 469 U.S. 325, 340–42 (1985) (allowing school officials to conduct warrantless searches upon reasonable suspicion). Government employees, similarly, have limited free speech rights. *See Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) ("When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom."). And "the Supreme Court has made abundantly clear that children's rights are not coextensive with those of adults." *Schleifer v. City of Charlottesville*, 159 F.3d 843, 847 (4th Cir. 1998).

Status-based restrictions on felons' constitutional rights are wholly consistent with that trend. Convicted felons, for example, can lawfully be deprived of the right to vote. *See Richardson v. Ramirez*, 418 U.S. 24, 54 (1974). They can be barred from public office. *See Spencer v. Kemna*, 523 U.S. 1, 8–9 (1998). They can be deprived of the right to serve on a jury.

*See* 28 U.S.C. § 1865(b)(5). And as *Heller* recognized, they can be disarmed: Because the *Heller* Court defined the Second Amendment's protections to extend only to "law-abiding citizens," it explained that felons were appropriately restricted from possessing firearms. *See id.* at 626 ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons . . . ."). So did the *McDonald* Court. *See* 561 U.S. at 786 (repeating [*Heller*'s] "assurances" about longstanding prohibitions).

\* \* \*

In summary, the Second Amendment's text—which enshrines the right of armed self-defense for "law-abiding citizens," the members of the political community—does not protect King. He has chosen *not* to be a law-abiding citizen and thereby forfeited his right to possess a firearm.

    ii.  <u>Section 922(g)(1) Is Consistent with the Historical Tradition of Firearms Regulation in America</u>

Even if the court assumes that felons are among "the people" described in the Second Amendment, King fares no better under the history-and-tradition portion of the *Bruen* test. Section 922(g)(1) passes constitutional muster because analogous laws close in time to the founding demonstrate that felon restrictions on firearm possession are consistent with the history and tradition of the Second Amendment.

As a reminder, the government must demonstrate that a challenged regulation is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. To do so, the government may lean on analogical reasoning, which "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2133 (emphasis in original).

King argues that the historical analysis becomes more exacting depending on the circumstances. In his telling, if a challenged regulation aims at a "general societal problem that has persisted since the 18th century," then the government must identify a "distinctly similar" historical regulation to justify the challenged regulation. ECF No. 39 at 12. If the challenged regulation is aimed at a problem "unimaginable" at the founding, then the challenged regulation needs only be "relevantly similar" to a historical counterpart. *Id.*

This bifurcated test misreads *Bruen* and inflates the government's burden. King cites a page that reads:

> In some cases, that [text-and-history] inquiry will be relatively straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is **relevant evidence that the challenged regulation is inconsistent with the Second Amendment.**

*Id.* at 2131 (emphasis added). Nowhere in the opinion did the *Bruen* Court outline two separate methods for historical analysis: It merely (and logically) explained that historical analysis could range from the simple to the complex. As a result, the government's burden in the second step of *Bruen* is simply to identify a "well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2133 (emphasis in original).

Even assuming for argument's sake that *Bruen* did set forth a bifurcated test, modern firearm regulations limiting possession by felons are not simply a new attempt to address a "general societal problem" that has existed for centuries. Guns and gun violence are manifestly different today than they were two hundred years ago, and the connection between guns and crime has similarly changed in unanticipated ways, as have the societal

uses and needs for firearms. Moving from a primarily agrarian and rural society (where many citizens may have owned and used firearms as part of their livelihoods) to a nation filled with large urban areas and plagued by recurrent mass shootings involving far more advanced firearms has created new and different societal problems that warrant legislative attention. *See Jackson*, 69 F.4th at 504 ("Congress enacted an analogous prohibition in § 922(g)(1) to address *modern conditions*.") (emphasis added). Simply because both felons and guns existed in 1790 does not imply societal problems involving guns and felons are the same—meaning that even if a bifurcated test existed, the government would have no duty to ferret out "distinctly similar" regulations, and the relevant inquiry would still be whether there existed representative historical analogues.

In terms of identifying an appropriate historical analogue, *Bruen* instructs that "when it comes to interpreting the Constitution, not all history is created equal." *Id.* at 2136. Historical evidence that long predates the Second Amendment (1791) or the Fourteenth Amendment[6] (1868) "may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years." Similarly, post-enactment history must not be "give[n] more weight than it can rightly bear." *Id.*

There are two broad categories of historical analogues for restrictions on felons' possession of firearms. First, English, colonial American, and American legislatures from the Founding to the Civil War understood that they could disarm persons believed not to be "peaceable" or "orderly"—or, put another way, "law-abiding, responsible citizens." And

---

[6] The *Heller* Court discussed, but did not wade into, an "ongoing scholarly debate" about the effect of the Fourteenth Amendment on the interpretation of the original Bill of Rights. *See id.* at 2138; *see also id.* at 2162 (Barrett, J., concurring) (discussing the scholarly divide).

although those restrictions did not turn specifically on a person's status as a felon, they establish the discretionary power of a legislature to disarm certain *categories* of people deemed potentially dangerous or who are not "law-abiding, responsible citizens." *Jackson*, 69 F.4th at 504 ("Legislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed. In reasoning by analogy from that history, 'the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated.'") (quoting *Bruen*, 142 S. Ct. at 2132). And second, the stiff penalties for felony offenses at the time of the Founding further confirm that legislatures could lawfully disarm felons.

### 1. Firearm Disqualification Laws

"[M]ost scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" *Carpio-Leon*, 701 F.3d at 979 (quoting *United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010))[7]. Classical republican political philosophers portrayed the bearing of arms as a hallmark of civic virtue, the "ultimate expression" of which was the "defensive use of arms against criminals, oppressive officials, and foreign enemies alike." *See*

---

[7] Like *Moore* and *Pruess*, *Carpio-Leon* remains good law because it expressly does not undertake a means-end analysis. *See id.* at 982. Therefore, its discussion of evidence from colonial governments, the debates on the Constitution and Bill of Rights, and pre-founding English rights, as well as its conclusion that the "historical evidence support[s] the notion that the government could disarm individuals who are not law-abiding members of the political community" are binding on this Court's analysis. *See id.* at 979–82.

The *Pruess* Court expressed a similar view on the historical record in dictum, noting "substantial evidence that the Founders severely limited the right to bear arms, excluding from its protection a broad range of often non-violent individuals and groups deemed 'dangerous.'" *Pruess*, 703 F.3d at 246 n.3.

Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 L. & Contemp. Problems 143, 146 (1986).

"[L]egislatures traditionally employed status-based restrictions to disqualify categories of persons from possessing firearms." *Jackson*, 69 F.4th at 505. From 1600s England to the American Civil War, legislatures possessed and exercised broad authority to disarm persons who disobeyed the law, presented a danger to others, or otherwise were regarded as untrustworthy.

*English Common Law.* Although "courts must be careful when assessing evidence concerning English common-law rights," mindful that it departs from American law at points, the Second Amendment "codified a right inherited from our English ancestors." *Bruen*, 142 S. Ct. at 2127, 2136. Parliament first recognized a legal right to possess arms in the Bill of Rights, 1 W. & M. Sess. II, c. 2 (1688) (Eng.). The Bill recited that King James II, who had been deposed in the Glorious Revolution, had disarmed "severall good subjects being Protestants." *Id.* To prevent the repetition of that abuse, the Bill guaranteed that "the Subjects which are Protestants may have Arms for their Defence suitable to their Conditions and as allowed by Law." *Id.*

While the Bill of Rights condemned the disarming of "good subjects," it allowed the disarming of subjects perceived to be disloyal or untrustworthy. After the Glorious Revolution, one manifestation of that trend was a 1689 act "for the better secureing the Government by disarming Papists and reputed Papists," which provided that any Catholic who refused to make a declaration renouncing his or her faith could not "have or keepe in his House or elsewhere" any "Arms[,] Weapons[,] Gunpowder[,] or Ammunition (other than

19

such necessary Weapons as shall be allowed to him by Order of the Justices of the Peace . . .

for the defence of his House or person).” 1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the*

*Realm* 71–73 (1688); *see also Heller*, 554 U.S. at 582.

The English Bill of Rights also did not displace the Militia Act of 1662, which

authorized local officials to disarm individuals they judged “dangerous to the Peace of the

Kingdome.” 14 Car. 2, c. 3, § 13 (Eng.). Consistent with the Militia Act, the Crown often

directed local officials to disarm those whom it did not trust to use weapons responsibly—

for instance, those who had “disturbed the public Peace.”[8] Privy Council to Lord Newport

(Jan. 8, 1661), *in Transactions of the Shropshire Archaeological and Natural History Society*, pt. 2, 3d

ser., vol. 4, at 156 (1904); *see, e.g.*, *Calendar of State Papers, Domestic Series, Charles II, 1661-1662*,

at 538 (Nov. 1, 1662) (Mary Anne Everett Green ed., 1861) (instructions to “cause good

watch to be kept in the highways” and to disarm “such as travel with unusual arms at

unseasonable hours”); *Calendar of State Papers, Domestic Series, 1670*, at 237 (May 26, 1670)

(Mary Anne Everett Green ed., 1895) (instructions to disarm “dangerous and disaffected

persons”); *Calendar of State Papers, Domestic Series, May 1,1684–February 5, 1685,* at 26 (May 20,

1684) (F.H. Blackburne Daniell & Francis Bickley eds., 1938) (instructions to dispose of

arms seized from “dangerous and disaffected persons”).

The understanding that the government could lawfully disarm irresponsible subjects

remained intact at the time of the American Revolution, as one widely discussed episode

---

[8] Contrary to the Fifth Circuit's assumption in *Rahimi*, this practice continued after the adoption of the English Bill of Rights. *See, e.g.*, *Calendar of State Papers, Domestic Series, Of the Reign of William III, 1 April, 1700–8 March, 1702*, at 234 (Feb. 26, 1701) (Edward Bateson ed., 1937) (instructions to disarm “dangerous” persons); Privy Council to the Earl of Carlisle (July 30, 1714), *in Historical Manuscripts Commission, Tenth Report, Appendix, Part IV* 343 (1885) (similar); Lord Lonsdale to Deputy Lieutenants of Cumberland (May 20, 1722), *in* Historical Manuscripts Commission, *Fifteenth Report, Appendix, Part VI* 39-40 (1897) (similar); Order of Council to Lord Lieutenants (Sept. 5, 1745), *in* Historical Manuscripts Commission, *Report on the Manuscripts of the Marquess of Lothian, Preserved at Blickling Hall, Norfolk* 148 (1905) (similar).

illustrates. In 1780, London officials reacted to widespread rioting by confiscating the rioters' arms. *See* Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 130–31 (1994). The House of Lords debated—and rejected—a motion declaring that the confiscation violated the English Bill of Rights. *See id.* at 131–32. Members defended the confiscation on the ground that it applied only to the "disorderly" "mob," not to "sober citizens" or "citizens of character." *See, e.g.*, 21 *The Parliamentary History of England, from The Earliest Period to the Year 1803*, at 691 (T.C. Hansard 1814) (speech of Lord Amherst) (June 19, 1780) (defending disarmament of the "mob"); *id.* at 730–31 (June 21, 1780) (speech of Lord Stormont) (distinguishing "disorderly" persons from "sober citizen[s]"). The press similarly distinguished "the riotous mob" from "citizens of character." 49 *The London Magazine or Gentleman's Monthly Intelligencer* 518 (Nov. 1780); *see, e.g.*, 42 *The Scots Magazine* 419 (Aug. 1780) (distinguishing "suspicious persons" from "reputable citizens"). And private groups that supported the right to bear arms warned that the confiscation did not set a precedent for disarming "peaceable Subjects." *See* 2 *The Remembrancer; or, Impartial Repository of Public Events, for the Year 1780,* at 139 (1780) (resolutions adopted in York); 1 *The Remembrancer; or Impartial Repository of Public Events, for the Year 1781*, at 24 (1780) (resolutions adopted in Middlesex); *id.* at 112 (resolutions adopted in Huntingdonshire).

In short, although the English Bill of Rights secured a right to possess arms, the government could (and did) disarm those who could not be trusted to use arms lawfully and responsibly. Because the English right "has long been understood to be the predecessor to our Second Amendment," *Heller*, 554 U.S. at 593, that background strongly suggests that the

Second Amendment likewise allows Congress to disarm individuals who are not law-abiding, responsible citizens.

*Colonial and Revolutionary America*. The American colonies inherited the English tradition of broad legislative authority to disarm people deemed to be untrustworthy, dangerous, or irresponsible. One pervasive use of that authority manifested in restrictions on firearms possession by Native Americans, Black people, and religious minorities.[9] While such odious prohibitions "would be impermissible today under other constitutional provisions," they are nevertheless "relevant . . . in determining the historical understanding of the right to keep and bear arms." *Jackson*, 69 F.4th at 503.

The history of Colonial and Revolutionary America also furnishes other examples in which individuals were disarmed based on legislative perceptions that they were dangerous, disorderly, or otherwise incapable of being trusted with arms. Massachusetts, for example, disarmed the supporters of an outspoken preacher in the 1630s "not because those supporters had demonstrated a propensity for violence," but because of their "disavowal of the rule of law" and failure to demonstrate "obedience to the commands of the

---

[9] *See* Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* 28–29 (2006); *see also, e.g., Laws and Ordinances of New Netherland, 1638-1674*, at 18-19 (1868) (1639 New Netherland law); 1 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 255–56 (1823) (1643 Va. law); 5 *Records Of The Colony Of New Plymouth* 173 (1856) (1675 Plymouth law); 2 *Records of the Colony of Rhode Island and Providence Plantations* 561 (1857) (1677 R.I. law); 2 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 481–82 (1823) (1680 Va. law); *Grants, Concessions, and Original Constitutions of the Province of New Jersey: The Acts Passed During the Proprietary Governments, and Other Material Transactions Before the Surrender Thereof to Queen Anne* 341 (1753) (1694 N.J. law); 2 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 235 (1896) (1706 Pa. law); 1 *The Laws of Maryland, With The Charter, The Bill of Rights, The Constitution of The State, and Its Alterations, The Declaration Of Independence, And The Constitution Of The United States, And Its Amendments* 117–18 (1811) (1715 Md. Law); 6 *The Public Records Of The Colony Of Connecticut* 381–82 (1872) (1723 Conn. law); *Laws of New York From The Year 1691 to 1773*, at 199 (1752) (1730 N.Y. Law); *A Complete Revisal of All the Acts of Assembly, of the Province of North-Carolina, Now in Force and Use* 152–54 (1773) (1753 N.C. law); 6 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 319–20 (1899) (1763 Pa. law); *Digest of the Laws of the State of Georgia From Its First Establishment as a British Province Down to the Year 1798, Inclusive, and the Principal Acts of 1799*, at 153–55 (1800) (1768 Ga. Law).

government." *Id.* (citations omitted). To take another example, during the French and Indian War, Virginia imported the English tradition of disarming Catholics who refused to take a loyalty oath. *See* 7 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 35–39 (1820) (1756 Va. law). The Virginia statute tied disarmament to failure to take a loyalty oath—and exempted those who took the oath after previously refusing. *Id.* at 38.

During the Revolutionary War, American legislatures passed numerous laws disarming individuals perceived to be disloyal to the revolutionary cause, and thus potentially dangerous. An early example is a 1775 Connecticut law providing that any person convicted of "libel[ing] or defam[ing]" any acts or resolves of the Continental Congress or the Connecticut General Assembly "made for the defence or security of the rights and privileges" of the colonies "shall be disarmed and not allowed to have or keep any arms." *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776*, at 1993 (1890) (1775 Conn. law).

In 1776, the Continental Congress recommended that the colonial governments disarm those who were "notoriously disaffected to the cause of America" or who simply "have not associated" with the colonial governments in the war effort. 4 *Journals of the Continental Congress 1774-1789*, at 205 (1906) (resolution of March 14, 1776). At least six of the governments enacted legislation in this vein. *See* 5 *The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 479–84 (1886) (1776 Mass. law); 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (1862) (1776 R.I. law); 1 *The Public Acts of the General Assembly of North Carolina* 231 (1804) (1777 N.C. law); *Acts of the General Assembly of the State of New-Jersey at a Session Begun on the 27th Day of August, 1776*, at 90 (1777)

(1777 N.J. law); 9 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 112–13 (1903) (1777 Pa. law); 9 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 282 (1821) (1777 Va. law).

The enacting legislatures, like their historical predecessors, categorically disarmed persons judged to be outside the law-abiding, trustworthy political community. A common feature of this set of laws was to require oaths of loyalty to the government and to strip anyone who failed or refused to take the oath of the right to bear arms. *See, e.g.*, 1776 Mass. law at 479–80; 1776 R.I. law at 566–67; 1777 N.C. law at 229–31; 1777 Pa. law; at 111–13; 1777 Va. law at 281–82. Many of these laws provided that failing or refusing to take the oath resulted in forfeiture of a bundle of other political rights, including the rights to vote, to serve on juries, and to hold public office—illustrating the classical republican view that bearing arms is a civic right. *See* 1776 Mass. law at 481; 1777 N.C. law at 231; 1777 Pa. law at 112–13; 1777 Va. law at 282; Kates, *supra*; *see also* Akhil Reed Amar, *The Bill of Rights* 48 (1998) (explaining that arms bearing was historically understood as a "political right"). In sum, the disarmament measures adopted during the Revolutionary period exemplify the broad authority and discretion of legislatures to disarm individuals perceived to jeopardize public safety or order.

*Founding Era*. Many precursors to the Second Amendment described the class of persons entitled to keep and bear arms using synonyms for "law-abiding, responsible citizens." In 1780, for example, the town of Williamsburg proposed amending the newly drafted Massachusetts constitution to provide that "the people have a right to keep and bear Arms for their Own and the Common defence." *The Popular Sources of Political Authority:*

*Documents on the Massachusetts Constitution of 1780*, at 624 (Oscar Handlin & Mary Handlin eds., 1966). The town explained: "we esteem it an essential priviledge to keep Arms in Our houses for Our Own Defence and *while we Continue honest and Lawfull Subjects of Government* we Ought Never to be deprived of them." *Id.* (emphasis added).

Anti-Federalists expressed a similar understanding of the right at Pennsylvania's ratifying convention. They proposed a bill of rights that, among other things, forbade "disarming the people, or any of them, **unless for crimes committed**, or real danger of public injury from individuals."[10] 2 *The Documentary History of the Ratification of the Constitution* (*Documentary History*) 598 (Merrill Jensen ed., 1976) (emphasis added). The Federalists defeated the proposal, but the Anti-Federalists published it in the Dissent of the Minority of the Convention, *id.* at 624, which was widely read and proved "highly influential," *Heller*, 554 U.S. at 604. A contemporary commentator, discussing the proposal, agreed that Congress should have the power to disarm individuals who posed a "real danger of public injury." Nicholas Collin, *Remarks on the Amendments to the Federal Constitution . . . by a Foreign Spectator*, No. 11 (Nov. 28, 1788), *in Three Neglected Pieces of the Documentary History of the Constitution and Bill of Rights* 40 (Stanton D. Krauss ed., 2019).

At the Massachusetts ratifying convention, Samuel Adams similarly proposed a bill of rights that would have denied Congress the power "to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." 6 *Documentary History* 1453 (John P. Kaminski & Gaspare J. Saladino eds., 2000) (emphasis added). A contemporary

---

[10] As the D.C. Circuit explained, "[t]he use of the word 'or'" in this proposal reflects that "criminals, in addition to those who posed a 'real danger,'" have historically been "proper subjects of disarmament." *Medina v. Whitaker*, 913 F.3d 152, 158–59 (D.C. Cir. 2019).

described the proposal as an effort to protect "the right of *peaceable citizens* to bear arms." Letter from Jeremy Belknap to Ebenezer Hazard (Feb. 10, 1788), *in* 7 *Documentary History* 1583 (John P. Kaminski & Gaspare J. Saladino eds., 2001) (emphasis added). The convention rejected the proposal, but only because Adams had waited until the morning of the day of ratification to present it. *Id.*

Although those precursors used different language from the Second Amendment and were neither codified nor enacted (as King himself notes), they shed light on the Amendment's meaning. *See Heller*, 554 U.S. at 604 (relying on the "minority proposal in Pennsylvania" and "Samuel Adams' proposal"). The Amendment codified a "pre-existing," "venerable," and "widely understood" right, making it unlikely that "different people of the founding period had vastly different conceptions" of its scope. *Id.* at 603–05. The precursors discussed above reveal a common conception that the government may disarm those who are not law-abiding, responsible citizens.

*Post-Founding.* Antebellum commentators shared the Founding generation's understanding of the Second Amendment's scope. Although not every commentator who discussed the right specifically addressed the government's power to disarm certain individuals, those who did address the issue confirmed that the government may disarm those who are not responsible or law-abiding.

For example, John Holmes, a legal scholar from Maine, interpreted the Second Amendment and its state counterpart to mean that a "free citizen, *if he demeans himself peaceably*, is not to be disarmed." John Holmes, *The Statesman, or Principles of Legislation and Law* 186 (1840) (emphasis added). "Thus are the rights of self defence guarded and secured," he

added, "to every one *who entitles himself by his demeanor* to the protection of his country." *Id.*
(emphasis added). A state convention in Rhode Island resolved that the Second Amendment
forbade "taking from peaceable citizens their arms." *State Convention of the Suffrage men of Rhode
Island*, Vermont Gazette, Dec. 13, 1842, at 1. And Joseph Gales, a mayor of Washington,
D.C., recognized the right of a "peaceable citizen" to bear arms, but asked rhetorically, "why
should not the lawless ruffian be disarmed and deprived of the power of executing the
promptings of his depraved passions?" Joseph Gales, *Prevention of Crime*, *in* O.H. Smith, *Early
Indiana Trials and Sketches* 466-467 (1858).

Opponents of slavery voiced similar views during the Bleeding Kansas conflict of the
mid-1850s. On the one hand, they supported disarming groups responsible for violence in
Kansas. Senator (and future Vice President) Henry Wilson, for instance, complained that
"armed bandits" were "violating law, order, and peace," and called for legislation "to disarm
any armed bands, from the slave States or the free States, who enter the Territory for
unlawful purposes." Cong. Globe App., 34th Cong., 1st Sess., 1090 (Aug. 7, 1856). Senator
Benjamin Wade likewise called on Congress to "[d]isarm these lawless bands." *Id.* at 1091.
On the other hand, opponents of slavery criticized Kansas authorities for disarming
"peaceable" free-state settlers. *See High-Handed Outrage in Kansas,* Holmes County Republican,
Oct. 30, 1856, at 1 (denouncing the disarmament of "[p]eaceable American [c]itizens" in
Kansas as a violation of their "constitutional rights"). A petition published in William Lloyd
Garrison's newspaper even urged the impeachment of President Pierce for his efforts to
disarm "peaceable citizens." A.J. Grover, *Impeachment of Franklin Pierce* (Aug. 1, 1856), *in* The
Liberator, Aug. 22, 1856, at 140.

Sources from during the Civil War reflect the same understanding. In 1863, a Union general ordered that "all loyal and peaceable citizens in Missouri will be permitted to bear arms." Hdqrs. Dep't of the Missouri, General Orders, No. 86 (Aug. 25, 1863), *in The War of the Rebellion: A Compilation of the Official Records of the Union and Confederate Armies*, ser. 1, vol. 22, pt. 2, at 475 (1888). A war memoir recounted a Union soldier's belief that "it was unconstitutional to disarm peac[e]able citizens." *Chickasaw, The Scout*, *in* R.W. Surby, *Grierson Raids* 253 (1865). And after the war, Senator Henry Wilson defended Congress's "power to disarm ruffians or traitors, or men who are committing outrages against law or the rights of men." Cong. Globe, 39th Cong., 1st Sess. 915 (1866).

As Reconstruction began, many southern States sought to disarm Black citizens, prompting "an outpouring of discussion" about the right to keep and bear arms. *Heller*, 554 U.S. at 614. Participants in that discussion affirmed the right to possess arms for self-defense, yet cautioned that the right protected only orderly, law-abiding citizens. In Georgia, for example, the Freedmen's Bureau issued a circular explaining that "[a]ll men, without distinction of color, have the right to keep arms," but that "[a]ny person, white or black, may be disarmed if convicted of making an improper and dangerous use of arms." H.R. Exec. Doc. No. 70, 39th Cong., 1st Sess. 65 (1866). The Bureau also recognized that the "freedmen of South Carolina have shown by their peaceful conduct that they can safely be trusted with fire-arms." H.R. Rep. No. 30, 39th Cong., 1st Sess. Pt. II, 229 (1866). And a Reconstruction order guaranteed the "constitutional rights of all loyal and well-disposed inhabitants" in South Carolina, but added that "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." Cong. Globe, 39th Cong., 1st Sess. at 908–09.

All in all, post-ratification sources point in the same direction as English and Founding Era sources. Although different commentators used different terms—"peaceable," "well-disposed," and so on—they recognized that a legislature could disarm those who were not law-abiding, responsible citizens. *See Jackson*, 69 F.4th at 505 ("In sum, we conclude that legislatures traditionally employed status-based restrictions to disqualify categories of persons from possessing firearms. Whether those actions are best characterized as restrictions on persons who deviated from legal norms or persons who presented an unacceptable risk of dangerousness, Congress acted within the historical tradition when it enacted § 922(g)(1) and the prohibition on possession of firearms by felons.").

In arguing to the contrary, King primarily clings to the erroneous premise that the government must identify "distinctly similar" historical precedents. He appears, however, to recognize that courts have not adopted his reading of the *Bruen* test. *See* ECF No. 39 at 17 ("A growing body of law . . . has looked to whether there are "reasonably related" or somewhat analogous laws in our Nation's history . . . .").

King argues that historical precedents are not "relevantly similar" to § 922(g)(1) because "the traditional laws of our Nation simply did not ban guns on a lifetime basis." *Id.* at 18. To begin with, this claim overstates a felony conviction's incapacitating effect. After all, convicted felons may, in certain instances, have their firearms rights restored. *See* 18 U.S.C. § 921(a)(20) ("Any conviction . . . for which a person . . . has had civil rights restored

shall not be considered a conviction for purposes of this chapter . . . .")[11]; Va Code § 18.2-308.2(C).

More fundamentally, this argument is a red herring. It simply repackages King's demand for historical precedent on all fours with § 922(g)(1). But *Bruen* requires no such thing: the government needs only to identify "a well-established a representative historical *analogue*, not a historical *twin*." 142 S. Ct. at 2133 (emphasis in original). King's inflated *Bruen* test would impose exactly the type of "regulatory straightjacket" the *Bruen* Court foreswore. *See id.* As the historical record demonstrates, legislatures before, during, and after the Founding possessed the power to disarm persons who were not law-abiding, responsible citizens. And they exercised that power to disarm various categories of citizens for the length of time deemed necessary to obviate the potential risks. That Congress has now determined a longer prohibition is appropriate for felons does not change the fact that Congress is deploying the same power (regulating firearm possession by potentially dangerous categories of people) to the same end (to prevent harm and ensure social order) and has thereby acted "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 1230.

The government has met that burden here. Each of the regulations discussed above demonstrate that the founders inherited, and continued, a tradition under which a legislature has broad discretion to disarm those who were not "law-abiding, responsible citizens."

Moreover, it's critical to note that there's no evidence Founding-era legislatures legislated to the furthest reaches of their constitutional capacity—i.e., just because a

---

[11] A federal statute, 18 U.S.C. § 925(c), also provides for restoration of firearms rights. However, since 1992, Congress has forbidden the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) from expending appropriated funds to review federal restoration petitions. *See Pontarelli v. United States Dep't of the Treasury*, 285 F.3d 216, 217–18 (3d Cir. 2002).

particular law was not passed, does not mean it could not have been passed, so its absence in the historical record does not definitively prove that it exceeds a legislature's constitutional power. *United States v. Kelly*, 2022 WL 17336578, at *2 (M.D. Tenn. Nov. 16, 2022). Indeed, the Court in *Bruen* specifically noted that although there were only a few examples of "sensitive places" where firearms could be prohibited, there was no evidence of disputes about the propriety of those restrictions, so they provided a basis for allowing potential restrictions on other analogous "sensitive places." *Bruen*, 142 S. Ct. at 2133. Likewise, while there are only certain subcategories of people under the "dangerousness" rubric that were expressly disarmed, there is no evidence that anyone historically disputed a legislature's capacity to disarm dangerous groups (King certainly has provided none), meaning additional subgroups could be lawfully disarmed and felon disarmament is simply an additional, constitutional exercise of the same legislative power.

## 2.  Felony Punishment Laws

Founding-era felony punishment laws represent a second category of analogous restrictions on felons' possession of firearms. At the time of the Founding, the commission of a felony resulted in deprivations of substantial constitutional rights, including the rights to life, liberty, and property. As a result, the forfeiture of the constitutional right to possess a firearm is broadly consistent with and analogous to the more exacting forfeitures wrought by historical punishment laws.

For centuries, felonies have been "the most serious category of crime." *Medina*, 913 F.3d at 158. In 1769, Blackstone defined a felony as "an offence which occasions a total forfeiture of either lands, or goods, or both, at the common law; and to which capital or

other punishment may be superadded, according to the degree of guilt." 4 William

Blackstone, *Commentaries on the Laws of England* 95 (1769). Blackstone observed that "[t]he

idea of felony is indeed so generally connected with that of capital punishment, that we find

it hard to separate them." *Id.* at 98.

Capital punishment and forfeiture of estate were also commonly authorized

punishments in the American colonies (and then the states) up to the time of the founding.

*Folajtar v. Att'y Gen.*, 980 F.3d 897, 904–05 (3d Cir. 2020). Capital punishment for felonies

was "ubiquit[ous]" in the late eighteenth century and was "'the standard penalty for all

serious crimes.'" *See Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., joined by Scalia, J.,

concurring in the judgment) (quoting Stuart Banner, *The Death Penalty: An American History* 23

(2002)). Indeed, the First Congress (which drafted and proposed the Second Amendment)

made a variety of felonies punishable by death, including nonviolent crimes related to

forging or counterfeiting a public security. *See* An Act for the Punishment of Certain Crimes

Against the United States, 1 Stat. 112–15 (1790). States in the early Republic likewise treated

"nonviolent crimes such as forgery and horse theft" as "capital offenses." *Medina*, 913 F.3d

at 159; *see* Banner, *supra*, at 18 (referring to specific examples of individuals in Georgia who

"escaped from jail after being condemned to death" for "forgery" or "horse-stealing"). And

many American jurisdictions up through the end of the 1700s authorized complete forfeiture

of a felon's estate. *See* Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277,

332 & nn.275–276 (2014) (citing statutes).

A few specific examples of state laws demonstrate the severe consequences of

committing a felony at the time. In 1788, just three years before the Second Amendment's

ratification, New York passed a law providing for the death penalty for crimes including counterfeiting (as well as burglary, robbery, arson, and malicious maiming and wounding). 2 *Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788)*, at 664–65 (1886) (1788 N.Y. law). The act established that every person convicted of such an offense was "liable to suffer death, shall forfeit to the people of this State, all his[] or her goods and chattels, and also all such lands, tenements, and hereditaments[] . . . at the time of any such offence committed, or at any time after." *Id.* at 666. For other felonies, the authorized punishment for "the first offence" was a "fine, imprisonment, or corporal punishment," and the punishment "for any second offense . . . committed after such first conviction" was "death." *Id.* at 665.

Two years earlier, New York had passed a law severely punishing counterfeiting of bills of credit. 2 *Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788)*, at 260–61 (1886) (1786 N.Y. law). The law said a counterfeiter "shall be guilty of felony, and being thereof convicted, shall forfeit all his or her estate both real and personal to the people of this State, and be committed to the [correction house] of the city of New York for life, and there confined to hard labor." *Id.* at 261. In addition, "to prevent escape," the defendant was to be "branded on the left cheek with the letter C, with a red hot iron." *Id.*

Similarly, in 1777, Virginia adopted a law for the punishment of forgery, which the legislature believed previously "ha[d] not a punishment sufficiently exemplary annexed thereto." *The Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature* 302 (1821) (1777 Va. forgery law). The act stated that anyone convicted of forging, counterfeiting, or presenting for payment a wide range of forged documents "shall

be deemed and holden guilty of felony, shall forfeit his whole estate, real and personal, shall receive on his bare back, at the publick whipping post, thirty nine lashes, and shall serve on board some armed vessel in the service of this commonwealth, without wages, for a term not exceeding seven years." *Id.* at 302–03; *see also, e.g.*, *A Digest of the Laws of Maryland* 255–56 (1799) (collecting Maryland forgery laws enacted between 1776 and 1778, each of which provided that those convicted "shall suffer death as a felon, without benefit of clergy").

As the D.C. Circuit has observed, "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Medina*, 913 F.3d at 158; Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 273 (2008) (explaining that founding-era proponents of a constitutional right to bear arms "did not object to the lack of an explicit exclusion of criminals from the individual right to keep and bear arms" during the debates over "what became the Second Amendment," because this limitation "was understood"). Thus, history and tradition show that "those convicted of felonies are not among those entitled to possess arms" under the Second Amendment. *Medina*, 913 F.3d at 158, 160.

### b. The Court Should Reject King's As-Applied Challenge as to § 922(g)

Text, history, and tradition yield the same result for King's as-applied challenge.[12] The "usual judicial practice" is to resolve as-applied challenges before facial ones, given concerns of judicial modesty and efficiency. *See Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 484–85 (1989); *Preston v. Leake*, 660 F.3d 726, 737–38 (4th Cir. 2011); *Fisher v. King*,

---

[12] It is unclear whether a Second Amendment as-applied challenge is even cognizable in the Fourth Circuit. "Only in dicta has the Fourth Circuit ever suggested that such . . . [a] challenge could theoretically be made." *Wagoner*, 2022 WL 17418000, at *5 (Dillon, J.).

232 F.3d 391, 395 n.4 (4th Cir. 2000). But that practice has little utility here, because King's as-applied challenge is essentially redundant with his facial one. *Wagoner*, 2022 WL 17418000, at *5 (Dillon, J.) ("Wagoner has not demonstrated that his circumstances 'remove his challenge from the realm of ordinary challenges.'") (citation omitted).

At the outset, King's challenge is arguably premature—an as-applied challenge would typically require additional facts found at a trial. *United States v. Silva*, 2022 WL 17540263, at *3 (W.D. Va. Dec. 8, 2022) (rejecting pre-trial as-applied constitutional challenge because there had been "no factual development" in the case). But in this case, the government agrees the Court can proceed on the basis of the information set forth in the parties' exhibits.[13] *United States v. Weaver*, 659 F.3d 353, 355 n.* (4th Cir. 2011) ("[A] district court may consider a pretrial motion to dismiss an indictment where the government does not dispute the ability of the court to reach the motion and proffers, stipulates, or otherwise does not dispute the pertinent facts.").

The precise basis for King's as-applied challenge is unclear—he references how long his convictions were, claims he's "peaceable," and highlights the restoration of certain civic rights. None of these validate his as-applied challenge.

For starters, even if the age of a conviction were a basis for finding § 922(g) inapplicable—and, to be clear, it's not; as explained above, Congress is entitled to dispossess categories of non-law-abiding individuals—it would not help King because he's hardly stayed on the straight-and-narrow since serving nearly a decade in prison for robbery and breaking-and-entering convictions. Rather, he racked up a number of probation revocations

---

[13] To that end, the government attaches as Exhibit A to this brief King's criminal history, upon which both parties rely.

upon release, as well as a third felony conviction for being a habitual offender of the traffic laws. His record reflects felony probation violations in 2014, 2016 and 2018, all of which resulted in jail time (3 months, 21 months, and 24 months, respectively).

Nor does the restoration of other civic rights meaningfully change the analysis. There is a procedure under Virginia law allowing a felon to petition for a restoration of firearm rights, *see* Va Code § 18.2-308.2(C), but there is no evidence that King has ever attempted to take advantage of it. Moreover, that he is now allowed to vote or serve on a jury does not mean he no longer presents a threat with a gun, and the state's willingness to restore certain rights does not signify that he should be awarded all of the privileges that he forfeited by virtue of his criminal conduct. In essence, Congress is constitutionally allowed to categorically determine that felons with firearms represent a threat to society, and the mere fact that King is now allowed to vote does not change that underlying conclusion or analysis. *See Jackson*, 69 F.4th at 506 n.4.

Finally, law enforcement's seeming acknowledgement that there are other, more dangerous criminals is not proof that King is sufficiently peaceable that § 922(g)(1)'s restrictions don't apply to him. Again, there is no exception for non-violent or "peaceable" felons—Congress is entitled to exclude all felons without incorporating a case-by-case or felony-by-felony analysis. *Id.* at 502 ("Given these assurances by the Supreme Court, and the history that supports them, we conclude that there is no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)."). And even if there were, King doesn't fit the bill. Unlike the successful as-applied challenger in *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023)—who was prohibited by a decades-old misdemeanor food stamp conviction—

King's circumstances do not suggest that § 922(g)(1) could be constitutional on its face, but unconstitutional as applied to him. Again, King has felony convictions for which he was sentenced to serve eight and a half years in state prison, followed by an additional conviction and repeated probation violations (and jail time). It may be there are additional, more dangerous criminals that law enforcement officers are worried about, but they are also clearly worried about the consequences of *his* firearm ownership, and the risk of danger that it could pose. If the best King can do is argue that he would only be secondarily liable for gun-related harm or injury, that's hardly clear evidence for the notion that he's outside the scope of harms § 922(g)(1) seeks to prevent and must be allowed to have a gun.

King, by virtue of his own conduct and failure to abide by the law, had no legitimate right to possess firearms. In short, he "simply does not fall within the category of citizens to which the *Heller* court ascribed the Second Amendment protection[.]" *Moore*, 666 F.3d at 319.[14]

### c. King's as applied challenge fails as to 26 U.S.C. §§ 5841, 5861(d) and 5871

King argues 26 U.S.C. §§ 5841, 5861(d) and 5871 are unconstitutional as applied to him because they resulted in a "due process Catch-22." ECF No. 39, at 28. King claims he was unable to abide by the requirement in § 5841 that he register his sawed-off shotgun because it would have required him to self-incriminate by admitting to a violation of § 922(g). His argument as to this National Firearms Act offense is premised on his argument that § 922(g) of the Gun Control Act is unconstitutional. For the same reasons articulated

---

[14] As noted in more detail above, *Moore* remains good law post-*Bruen*, and is binding on this Court. *See Robinson-Davis*, 2023 WL 2495805, at *3 (Cullen, J.) (resolving a *Bruen* motion by applying *Moore*).

above, King is prohibited from possessing *any* firearm because he is a convicted felon and has not conducted himself as a law-abiding citizen. As such, there is no Catch-22 here, and the court should reject this argument as well.

### d. King's argument as to § 842(i) fails

Finally, King claims that the charge for unlawfully possessing explosives as a felon (specifically, electric blasting caps) fails because the government is caught in a definitional Catch-22: Either (1) explosives are "firearms" and the statute allegedly fails the same historical *Bruen* test as § 922(g)(1); or (2) explosives are not "firearms," and his right to own them was therefore restored because his civic-rights restoration covered everything but firearms. King's argument is too cute by half and, like all of his other claims, it fails.

*First*, the Second Amendment does not apply to explosives, so it cannot render a charge for unlawfully possessing explosives unconstitutional. *Heller* made clear that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes," further making clear that the "lawful purpose" at issue was self-defense of hearth and home. *Heller*, 554 U.S. at 625, 627-29. *Heller* also explained that "arms," for Second Amendment purposes, does not include weapons designed for military capacity or used for military purposes. *Id.* at 581. In short, as the Seventh Circuit explained in summarizing *Heller, McDonald*, and *Bruen*, to receive Second-Amendment protection, the weapons must be those "that ordinary people would keep at home for purposes of self-defense[.]" *Bevis v. City of Naperville, Illinois*, 85 F.4th 1175, 1194 (7th Cir. 2023). Electric blasting caps do not satisfy that standard; absent some fanciful *Home-Alone*-style scenario, they are not a weapon typically kept at home by ordinary people for self-defense.

*Second*, blasting caps are not "firearms" for purposes of 18 U.S.C. § 842. King is mixing and matching statutes to get to his preferred outcome. Sections 922(g) and 842(i) are different statutes, in different chapters of Title 18, with different rules, and, critically, *different* definitions. Under § 842, "explosives" are defined in § 841(d), whereas "firearms," for purposes of § 922(g)(1), are defined in § 921(a)(3) and (4). Section § 921(a)(3) defines "firearm" to include destructive devices, but the definition of "destructive device" in § 921(a)(4) specifically *excludes* "any device which is neither designed nor redesigned for use as a weapon." Electric blasting caps, otherwise known as detonators, fall outside the definition of "firearm" in § 921(a)(3) for this reason but fall within the definition of "explosives" in § 841(d). Section 842(i) does not include any reference, statutorily or definitionally, to a firearm. King cannot smuggle in definitions from other parts of the U.S. Code and bootstrap a § 842 challenge to his *Bruen*-based firearms argument.

*Third*, even if King's rights restoration is understood to allow him, on a state level, to possess explosives, that would not change the fact he is still barred under federal law from possessing explosives. *See* 18 U.S.C. §§ 842(i) and 844(a); *see also* § 845(b) (setting forth specific procedures for seeking relief from the Attorney General from a prohibition under § 842(i)). King acknowledges as much but argues that the government would nonetheless be obligated to prove that King *knew* of his prohibited status—as is the case in § 922(g)(1) prosecutions following *Rehaif v. United States*, 139 S. Ct. 2191 (2019)—and suggests the government would be unable to carry that burden in light of the rights restoration.[15] But that

---

[15] In assessing the differences between §§ 922(g) and 842(i), it is worth noting that the definition of "crime punishable by imprisonment of a term exceeding one year" in § 921(a)(20) provides that any conviction "for which a person . . . has had civil rights restored shall not be considered a conviction for purposes of this chapter, unless such . . . restoration of

is a fact-based argument that would depend on a jury's fact-finding at trial, not an appropriate basis for a motion to dismiss.

More importantly, § 842(i) does not require the government to prove that the defendant knew his prohibited status. Unlike § 922(g), § 842(i) lacks any statutory mens rea. The Supreme Court relied on the fact that § 924(a)(2)—the penalty provision for § 922(g)—requires that a person "knowingly" violates certain of § 922(g)'s subsections to conclude the government had to prove knowledge-of-status. *Rehaif*, 139 S. Ct. at 2195. Because "knowingly" was in the text, it applied to all of the crime's elements. *Id.* But § 844(a)(1) lacks any defined mens rea, and simply punishes "[a]ny person who violates any of subsections (a) through (i)." So there's no textual hook for a knowledge-of-status requirement in § 842(i), the way there is under § 922(g)(1). Although courts have recognized that the defendant must knowingly possess the explosive, *see, e.g., United States v. Goff*, 517 F. App'x 120 (4th Cir. 2013), because "knowingly" is not in the statutory text, it isn't distributed to any other elements. Furthermore, § 842(i) addresses explosives, not firearms. And unlike firearms, explosive devices lack the "long tradition of widespread lawful . . . ownership by private individuals in this country." *Staples v. United States*, 511 U.S. 600, 610 (1994). A heightened mens rea, therefore, is not necessary to "separate wrongful from innocent acts." *Rehaif*, 139 S. Ct. at 2197. In fact, the Supreme Court in *Staples* explicitly distinguished firearms from explosives, when adopting a heightened mens rea regarding firearms: "there is a long tradition of widespread lawful gun ownership by private individuals in this country. Such a

---

civil rights expressly provides that the person may not . . . possess . . . firearms." The same term is defined in § 844(*l*) more broadly; no mention is made of rights restoration.

tradition did not apply to the possession of hand grenades in *Freed*." *Id.* at 610; *see also United States v. Freed*, 401 U.S. 601, 609 (1971) ("one would hardly be surprised to learn that possession of hand grenades is not an innocent act"). And the Fourth Circuit has made the same distinction, *specifically with respect to blasting caps*, in a case where the defendant sought to argue the government had to prove he knew blasting caps qualified as explosives: ""whereas 'guns in general are not deleterious devices or products or obnoxious waste materials that put their owners on notice that they stand in responsible relationship to a public danger,' the same cannot be said for blasting caps." *Goff*, 517 F. App'x at 127.[16]

For all of these reasons, the court should reject King's challenge to the § 842(i) charge and deny his motion.

## CONCLUSION

This court, and the vast majority of courts confronting this question, have concluded that § 922(g)(1) passes constitutional muster under *Bruen*. Text, history, and tradition inform that result. And King has similarly failed to make out viable challenges to § 842(i), or the registration requirements and penalties in 26 U.S.C. §§ 5841, 5861(d) and 5871. For those reasons, the government respectfully requests that King's motion be denied.

---

[16] The government notes that at least one court in this district has declined to follow this analysis and concluded that the government is obligated to prove *Rehaif*-style knowledge-of-status in § 842(i) cases. *See United States v. Wright*, Case No. 7:22-cr-15, ECF No. 90 (W.D. Va Sept. 7, 2023). For the reasons set for above, the government disagrees with that analysis.

Respectfully submitted,

CHRISTOPHER R. KAVANAUGH
United States Attorney

s/Kristin B. Johnson
Assistant United States Attorney
VA Bar No. 71115
310 1st Street SW, Suite 906
Roanoke, VA 24011
(540) 857-2250
Kristin.Johnson2@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on January 11, 2024, I caused to be filed electronically this Response In Opposition to Defendant's Amended Motion to Dismiss with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

s/Kristin B. Johnson
Assistant United States Attorney