IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| V. ) | Case No.: 7:23-CR-34 |
| ) | |
| ROBERT LEON KING ) | |
|       Defendant ) | |
| ) | |

**<u>ROBERT LEON KING'S SENTENCING MEMORANDUM</u>**



      Down in the holler nestled between the hills of the Blue Ridge, minutes from the famous Cascade Falls Trailhead, lies Robert Leon King's (Leon) childhood home. His mother, Ms. Joann Carper, still lives there. Given the size of the town, it is also minutes from where Mr. King got arrested. The small but comfortable home is chock-o-block full of items: crosses, religious paintings, figurines, and of course, family photos. It is stuffed full of memories, both tangible and intangible, but

incredibly tidy. Among the photos of Ms. Carper singing for her church, her recently diseased daughter (Mr. King's sister), and photos of her grandsons, are photos of Leon – as a child, as a football player, and as a man.

Among the less than 1,200 residents of Pembroke, if you mention the name Leon King, they will know who you are talking about.

Leon is as close to a celebrity as you can get in this small town. Immediately, Leon is described in two ways: the best football player Giles County had ever seen, and a kind man who would help anyone who needs it – help asked for or otherwise.

Surrounded by mountains, nature, and the New River, Pembroke features humble, neat homes you would expect to find in the country, complete with residents who love tradition – they prey, they fly the American flag, they watch football, they fish, and they hunt. They also know all their neighbors. Leon King is no exception.

Ms. Carper singlehandedly raised a home of rough and tumble boys and one daughter and she suffered no arguments. Eventually becoming a pastor, the community knew her as a tough but kind woman. She worked hard for her family, but they often had to help out in order to make ends meet. Mr. King did so in big ways – getting a football scholarship – and in more discreet ways – always helping his mother out, not letting her do the yard work, being there when she needed him.

Eventually, Mr. King flamed out. As an adult, he hit a rough patch, but he came back home. He became known as a devoted father, a reliable neighbor, and a fixture in the community.

2

Mr. King is not dangerous. He is the opposite. He respects the law and outside some driving offenses (and attendant probation hiccups), he has not been in trouble with the law for almost 30-years. He is older and not a risk of recidivism. He wants to stay out of trouble and help ferry his sons into high school and then, adulthood. His elderly mother and stepfather need his help. His community loves him, not just for what he did on the field, but for what he consistently does off the field, day-in and day-out.

Mr. Leon King should receive a sentence of time served, or 15 months in custody. Alternatively, Mr. King respectfully requests a downward departure to 24 months in custody.

**LEON KING: FOOTBALL LEGEND, SON, OUTDOORSMAN**

While his home life was a small one filled with a large amount of love, it was also the story of a young, working single mother with four children to care and provide for. Jeff Williams, a lifelong friend, tells the story of his father driving he and "the King boys" to the corner store after practice.[1] The elder Mr. Williams would tell the boys to get a treat – whatever they wanted. The Williams' were thinking of candy or chips or various treats young boys typically get at a corner store, but Mr. King would always pick up a loaf of bread, bologna, and a carton of milk. He shared these with his siblings.

Mr. King grew up loving the things every good Giles County boy grows up loving: hiking, camping, fishing, and hunting. He rode around on his ATV, learned

---

[1] As is apropos for Pembroke, the corner store is still there to this day.

to cook for his Mom, trapped small animals and shot the bigger ones, and his mom tried to make sure he went to church regularly.

Ms. Carper, now a retired minister, was at the time working as a nurse, and she had not yet met Mr. King's stepfather, Fred Carper[2]. Despite being busy making ends meet and raising four children, Ms. Carper attended her sons' football games and was well-known at Giles High School.

It was Mr. King, however, who was the true celebrity. Leon King is still a name that reverberates in the High School's hallways. He is living history. Mr. King, as a star running back, helped lead the home team to a state championship and perfect season in 1980. In several games, he wore a bandana, a symbol which became so famous, people would wave bandanas around when Leon King was playing, and "the bandana gang" was born. The school's snack shack is named after the phenomenon started by Mr. King.

 

---

[2] Indeed, it is a testament to Mr. King that he calls Mr. Carper his stepfather. Joann did not meet Fred until Mr. King was in his thirties – but Mr. King has since fully taken Fred on as his father, helping his mother care for him in his frailer state.

Eventually, the great Leon King went on to try his hand at college ball at Grambling State University, playing for the late, great Eddie Robinson. However, as so many young men and so many young athletes do, Leon King did not make it. Through either pride or immaturity, he couldn't cut it – one of his biggest regrets. He tried to walk on to the (then named) Washington Redskins, but did not make it, and then his cousin was gravely injured and Mr. King focused on his family. Ultimately, Mr. King's football dreams were laid to rest.[3]

> 11. What person or persons most influenced you to attend Grambling State University? (Please indicate relationship to you.)
> *No person or persons influenced me to attend this University, I just want to continue playing ball and to seek a higher education.*

All Leon King had ever wanted to do was play football and now that dream was over. He stayed with his brother in Richmond, Va, for a while, but ultimately returned to the Western District in Roanoke. As is apparent from Mr. King's criminal history, in his thirties, Mr. King was lost and found himself with the wrong people. He got in trouble. It bears noting that Mr. King's convictions stemmed from an Alford plea and a nolo contendre plea respectively. However, he did plead. He did go to prison, and he was forever saddled with the scarlet letter of "felon." That history is behind him – almost 30 years behind him.

It still follows him around today.

---

[3] From Mr. King's Grambling State University application.

## THE OFFENSE IS RELATIVELY MINOR

Mr. King is before this Court for a status offense. Not because he is dangerous, not because he committed any act of violence, and not because he was selling drugs.[4] He is here because a man born and raised in a tiny hamlet in the country where shooting and hunting is a way of life, had guns. The law as it is currently written states that Mr. King, by nature of an almost 30-year-old felony, cannot own guns in his own home.[5] He violated that. There is absolutely no evidence that these guns were used in an unsafe manner, were used in other crimes, or were for any nefarious purpose.

Mr. King owned guns in a town where guns are found and sold on almost every corner. They are a way of life. There are times when a felon in possession of a gun should be considered a serious violation of the law. This is not one of those times.



A store self-proclaimed as the "hunting n fishing headquarters," which sells guns, less than 5 minutes from Mr. King's home.

---

[4] Given the PSR and previous filings from the Government, it is likely an argument will be made that Mr. King was selling drugs, however, that is far from proven. This stems from a statement made by an incredibly biased, unreliable witness at grand jury proceedings – Ms. Tonya Martin; and Mr. King's statements while speaking to the police, which don't match reality. (For example: Mr. King mentions that he might have made $80,000 from meth – it takes one look at Mr. King's bank statements, his living situation, and his lifestyle to know that cannot in any way be true). There is simply no reliable evidence that Mr. King was involved in the drug trade. There is evidence that he lived with and interacted with those who were involved in that community but association with bad actors, especially in a town as small as Pembroke, is not evidence of crime itself.

[5] As discussed later in this memo, Mr. King also has a felony as a "habitual offender" of Virginia traffic violations, a felony which no longer exists (this conviction alone is from 15 years ago).

Mr. King also owned a gun that was altered, something that even if he were not a felon, he would have had to register for it to be legal. However, neither is this evidence of a man planning to use the gun for any dangerous means or a man who disrespects the law. This gun was found in a stool with a myriad of items consistent with a collector, in a room reminiscent of a hoarder. This home is evidence of a big kid – Mr. King kept the things he thought were cool or interesting. Yes, he had a shortened shotgun, but he also had an antique ball-and-cap gun and a suit of armor. Those items did not mean he was going to be a reenactor or work at Medieval Times – he found those items, liked them, and kept them. Just as he did with all of his guns. Owning these guns and the shotgun in particular does not make Mr. King a bogeyman planning to rob someone.

  

Photos from the search of Mr. King's room.

The Government may try to argue that this was the home where a Confidential Informant bought drugs. However, this was not Mr. King's home. He was staying there to help a cousin and indeed, 5 other people lived there. One person was Mr. King's ex-girlfriend and mother of his children, a convicted felon

7

and substance abuser, who was ultimately charged with the drugs in the home.[6] In a conversation with counsel, Mr. Jackie Link stated that as bad as the home (1006 Cascade Dr.) looks now, it looked worse before Mr. King got there and "tried to clean it up." It is clear that Mr. King was not the person engaging in any sort of drug trafficking out of the home.

Mr. King was just trying to live, but his activities (owning guns) were not dangerous nor a threat to anyone. He broke the law, but only by his status not any hazardous behavior.

## MR. KING: PILLAR OF THE COMMUNITY

Walk around for a day in Pembroke and it is clear that Leon King is not known for being dangerous and is certainly not known as a villain or criminal. In fact, in some cases his fabled football career is only mentioned after what he is truly known for – his kindness.

Every single person interviewed about Leon King mentioned his willingness to help out a friend and the benefit he is to those around him. His family explains that Mr. King was only ever at 1006 Cascade Dr, because his cousin, Timothy Chapman, needed help at the house. Tonya Martin (also known as Tanya Vaught), the mother of two of Mr. King's children, crashed at the house once Mr. King moved in (as did three other people) because she knew that Mr. King would assist her in times of need.

---

[6] According to publicly available information on Virginia's court record website, Ms. Martin was arrested the same day as Mr. King and charged with possession of a controlled substance. While counsel does not have records beyond this, it is a safe assumption that Ms. Martin was charged for any drugs in this home.

8

This is exactly the type of help that people consistently described Mr. King as performing.



An excerpt from a letter provided by Ms. Vicki Smith.

His uncle, Donnie King, and his Aunt Miriam described Leon as helping everyone he could. They described a man who was constantly checking in on his mother, on them, and who assisted an elderly neighbor. Another neighbor, Jackie Link, described Mr. King thus:

> Leon has always been a remarkable neighbor and a pillar of our community. He consistently demonstrated kindness and compassion, always willing to lend a hand to those in need. After I experienced serious heart issues, Leon took it upon himself to check on me every week. His visits were not just about offering assistance; they were about genuine concern and care. Whether it was running errands, helping with chores, or simply providing companionship, Leon's support during that difficult time was invaluable to me.

Indeed, even during Mr. King's arrest for these current charges, he described that one of the guns he was found with he had because he was holding for a friend, who wanted to keep it out of the hands of the friend's son. This is corroborated by everything everyone has said about Mr. King and what he does for the community. In his pre-trial bond report, Mr. King explained that he worked for a restaurant at one point but wasn't getting paid – a statement that seems ludicrous at first blush, until researching Mr. King's life, and suddenly it becomes apparent that is exactly the kind of thing Mr. King would do.

9

> I have known Leon since he was a child in grade school. I have never known him to be violent against anyone. He has raised two beautiful boys who really need and love him so much. Whenever I needed help in the past all I had to do was ask and he was right there. I wish him only the best and hope to see him home soon. Thank you for your time.[7]

Mr. King is not a danger to the community. He is widely known as the exact opposite. His presence is a boon to Pembroke and to Giles County at large. This is not just from the mouths of his family but from everyone – neighbors, friends, police officers, and coaches.

> After renovations were completed, I had occasion to hire Mr. King for various jobs in and around our home. He consistently arrived on-time, performed the work to my satisfaction and many times did not want to accept payment. And while this may or may not be relevant, I never observed Mr. King under the influence of alcohol or drugs.[8]

Mr. King has been described as a pillar of the community because he is. While he may no longer be the football star nor is he a doctor or lawyer or politician or pastor like his parents, he has lived his life in a way to prove you do not have to

---

[7] An excerpt from a letter from Brenda Hairston.
[8] An excerpt from a letter from Mark Clark.

10

be in order to be a person of character, a person respected and needed in the community.

### MR. KING: FATHER, SON, FAMILY MAN

Mr. King's sons are following in their football-star father's footsteps – both Treyvon and Darius play football after school, and they are excited to have their Dad back home. Even in jail he talks to them every day and tells his mother not to spoil them – even though he did when he was out as well. Although Treyvon and Darius did not live with Mr. King when he was arrested, that was a choice the family made.

Mr. King had a contentious, on-and-off again, volatile relationship with Treyvon and Darius's mother, Tonya Martin.[9] It is because of this relationship that Mr. King gave custody of his sons to his mother. He did not want Ms. Martin, a substance abuser, to try using the children against him. When Mr. King moved in with his cousin, Timothy, to assist him, Ms. Martin approached asking for help and a place to stay. Mr. King obliged.

Despite periodically not living under the same roof as Treyvon and Darius, Mr. King spent time with them every day and is a fixture in their lives. He always makes sure they do their homework, watched them practice football, taught them how to fish, went riding on the ATV with them, and even taught them to set traps for animals. Treyvon and Darius have even brought home some squirrels they've

---

[9] Of note, in Mr. King's PSR, probation cites Ms. Martin's testimony to the grand jury. Despite her testimony, Mr. King has never been convicted (or charged) with a drug offense. Ms. Martin, however, has, and is indeed under state indictment for possession of a controlled substance, stemming from the same search of the home in which guns owned by Mr. King were found.

11

shot with their pellet/bb gun as their grandmother apparently has a wonderful squirrel recipe – something Mr. King would also do when he was a child. (When counsel visited, she offered to make squirrel for counsel and Mr. Hancock, the defense mitigation specialist, one day, but we have yet to take her up on her offer.) Mr. King is also quite a cook himself and he is often in charge of the family BBQs hosted in Ms. Carper's yard.

As two young boys not even in their teenage years yet, they need and miss their father.

> Dear judge Im am Darius and I am leons son I wan,t him to come home please he is nice and respectful and kind he is a nice guy so please let him come home please thank you/ by Darius

A letter from Darius for Mr. King's (potential) bond rehearing, however, the sentiment stands.

> Dear Judge I am Treyvon King, I am Leons son I want him to come home to watch watch watch our football games and help coach our teams. and he's kind, and respectful, and I want to have adventures and do other things. so Please let him out so we can do all those things. By Treyvon king to Judge thank you.

A letter from Treyvon, also for Mr. King's bond rehearing.

12

> "My name is Carolyn Robertson, I am a neighbor of Leon King's family. I am praying that Leon can come home soon. His boys miss him and they need him. He is so good with them."

Trayvon and Darius are not the only ones who miss Mr. King. His mother and stepfather need Mr. King around the house. Ms. Carper is 79 years old, and Fred just recently turned 81. While Ms. Carper is relatively spry for her age – she still maintains a large vegetable garden and the couple attend church regularly, Mr. Carper is wheelchair-bound and they relied on Mr. King for help surrounding much of the daily chores and living required. Mr. King's two German Shepherds, who needed to be moved from the house where Mr. King was arrested, currently live with the Carpers, and they just got a puppy. It is a full house.

There is, however, as always, a room waiting for Leon King.



The room that was Mr. King's, and where he stays when with his mother.

## MR. KING'S CRIMINAL HISTORY POINTS OVERESTIMATE HIS RECENT CRIMINAL HISTORY

Mr. King should not receive three points for his violation of the Virginia Habitual Offender law.

The Fourth Circuit has noted that criminal history is "one of the most flexible concepts in the guidelines" because of the difficulty of precisely evaluating the "countless possible permutations of criminal history." *United States v. Murray*, No. 4:16CR64, 2017 WL 786272, at *4 (E.D. Va. 2017). Courts have granted downward departures to lower Criminal History Categories when the defendant's record consisted primarily of non-violent offenses. *See United States v. Nelson*, 166 F. Supp. 2d 1091, 1099 (E.D. Va. 2001).

Mr. King received 3 points for his 2008 conviction of "habitual offender" – a second time driving with a suspended license. (He has since got his license back). He originally received, after suspended time, 1 year incarceration. If no probation violations on this charge existed, it would have earned Mr. King 2 points for criminal history and would have "expired" completely for purposes of criminal history categorization in 2019. USSG §4A1.1. However, Mr. King racked up several probation violations on this charge, which extended his incarceration time and extended it past the 10-year "expiration" time frame, earning him 3 points for criminal history. However, this law was repealed in 2021. It no longer exists. It was repealed before Mr. King was ever arrested on the current charge. For this reason, given the nature of the law (driving violations), the fact that it was repealed, and save for probation violations (which Mr. King would never have been on given the

14

state of today's law) this charge would not be counted in criminal history, the Court should grant a downward departure and consider Mr. King a Category I for purposed of criminal history categorization.

## MR. KING SHOULD NOT RECEIVE TWO POINTS FOR OWNING A DESTRUCTIVE DEVICE

Mr. King should not receive a 2-point enhancement for owning a destructive device in connection to this offense. USSG § 2K2.1, defines destructive device as the meaning given that term in 26 U.S.C. § 5845(f). 26 U.S.C. § 5845(f) specifically states that, "[t]he term "destructive device" shall not include any device which is neither designed nor redesigned for use as a weapon…" While blasting caps could potentially be seen as a "similar device," to the ones listed earlier in the definition of 26 U.S.C. § 5845(f), they were neither designed nor redesigned as a weapon and thus do not fit the definition of a destructive device under 26 U.S.C. § 5845(f) or USSG § 2K2.1.

Even if they do meet the definition, it is clear Mr. King did not know what they were. As seen in the picture above, the blasting caps looked like a bundle of wires (and they were thrown in with a bunch of other items in a stool compartment). They needed to be attached to a car battery in order to even work, and Mr. King himself stated, "I didn't even know what they was." Probation believes knowledge does not matter and that ownership is enough. However, there is reason to believe knowledge is necessary for the 2-point enhancement.

First, from a policy perspective, if knowledge is not needed then a parade of horribles could occur – throwing enhancements on people who are blissfully

15

ignorant. It cannot be that an enhancement and thus additional YEARS in jail can stem from unknowingly possessing something. If Mr. King owned a certain type of firework to celebrate the Fourth of July, would that count? If it did, and he did not understand that firework was a destructive device, should he receive years in jail? What if someone gave him an antique or mock grenade, the kind sold in every battleground souvenir shop, but it turns out, through no fault of Mr. King, this was *real* – does he deserve years on his sentence?

Backing away from hypotheticals, however, the Guidelines themselves seem to imply that knowledge is a requirement. In the Commentary of USSG § 2K2.1, the Commission discusses the state of mind of an offender, specifically regarding subsection (b)(4)(A), and states that an enhancement for a stolen firearm or obliterated serial number applies whether or not the offender knew of the fact. The Commission clearly considered knowledge with regard to these enhancements and clarified that this specific enhancement does not need a person's knowledge. If owning a destructive device did not require a person's knowledge, the Commission would have stated so, as it did with regard to stolen firearms/obliterated serial numbers. *Expressio unius est exclusio alterius.*

The plus 2 enhancement for "involving destructive devices" should not apply.

**MR. KING'S AGE WARRANTS A DOWNWARD DEPARTURE, WHICH IS SPECIFICALLY CONTEMPLATED BY THE US SENTENCING GUIDELINES**

Mr. King celebrated his 61st birthday behind bars in the Roanoke City Jail. According to USSG § 5H1.1, "Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as

16

home confinement might be equally efficient as and less costly than incarceration."

While Mr. King would certainly take issue with being labeled as old and infirm[10], his age is specifically contemplated by the United States Sentencing Commission as a reason to vary downward from the Guidelines. This makes sense as the Commission has found that older offenders recidivate at rate less than half of those people who were under the age of 50 (21.3 percent versus 53.4 percent).[11] Taking Mr. King's age into consideration would prevent severe sentencing disparities, even if substantially varying under the prescribed guidelines, as "roughly a third (31.3%) of offenders 65 through 69 and more than 40 percent (42.1%) of offenders 70 and older received an alternative sentence or fine."[12]

Mr. King is a rarity in the Federal system – in 2021, only 12.9 percent of those convicted of a federal offense were 50 or older and of those, only about 16 percent were aged 60-64. Thus, Mr. King, a man in the upper echelon of ages convicted in the federal system, who also suffers from diabetes, hypertension, and herniated discs, is the exact type of person for whom the guidelines themselves envision a downward departure.

Certainly, he is unlikely to recidivate, just by nature of his age, and no one believes that Mr. King's life should be shortened, or his health should suffer because of a status crime, but that is exactly what a long prison sentence would do to someone in Mr. King's condition as "the aging process accelerates once an offender

---

[10] His counsel apologizes.
[11] Older Offenders in the Federal System, USSC 2022 July,
[12] Id.

is incarcerated and offenders can feel relatively old at a younger age and physical changes may stand out earlier."[13]

> Studies have shown that a 59-year-old in prison has the same morbidity rate as a nonincarcerated 75-year-old and people in prison are much more like to show signs of cognitive decline, including dementia, at an earlier age than the general population.

[14]

It is clear that life behind bars for an aging inmate does not just effect their quality of life, but prison ***shortens*** their life.

Besides the fact that Mr. King's age makes him substantially more likely to suffer in prison, but substantially less likely to recidivate, it is unquestionable that prison has an adverse effect on someone's health. This is not in dispute; it is a fact. Those in prison are more likely to have a host of medical issues when compared to the general population,[15] incarceration itself can cause a host of lasting mental health conditions[16], and those in the BOP are not receiving adequate medical care.[17]

In the world outside prison walls, a man with Mr. King's conditions and at his age is able to live a relatively normal life if he focuses on his health, improving his lifestyle, and abides by doctor's orders. In prison, that is almost impossible. To

---

[13] Older Offenders in the Federal System, USSC 2022 July, Pg 2.
[14] *Prison Health Care Crisis Mounts as Incarcerated Population Ages*, EQUAL JUSTICE INITIATIVE, May 14, 2024, https://eji.org/news/prison-health-care-crisis-mounts-as-incarcerated-population-ages/
[15] *Incarceration*, HEALTHY PEOPLE 2030, https://health.gov/healthypeople/priority-areas/social-determinants-health/literature-summaries/incarceration#:~:text=Studies%20have%20shown%20that%20when,%2C%20hepatitis%20C%2C%20and%20HIV "Studies have shown that when compared to the general population, people of both sexes who are incarcerated are more likely to have high blood pressure, asthma, cancer, arthritis, and infectious diseases, such as tuberculosis, hepatitis C, and HIV."
[16] Katie Rose Quandt and Alexi Jones, *Research Roundup: Incarceration can cause lasting damage to mental health*, PRISON POLICY INITIATIVE, May, 13, 2021, https://www.prisonpolicy.org/blog/2021/05/13/mentalhealthimpacts/
[17] Meg Anderson, *Lawmakers push for federal prison oversight after reports of inadequate medical care*, NPR, Dec. 13, 2023, https://www.npr.org/2023/12/12/1218627629/lawmakers-push-for-federal-prison-oversight-after-reports-of-inadequate-medical-

be a healthy individual, Mr. King would have to rely on luck and beating the odds just to ensure his condition does not worsen.

Mr. King should not spend his golden years behind bars.

## CONCLUSION

Mr. King should not spend any more time than he already has behind bars. Defense is requesting the Court sentence Mr. King to time served or 15 months. That is a sentence that is sufficient but not greater than necessary. However, should the Court feel the need to sentence to a guidelines sentence, Mr. King's Guidelines should be calculated without the plus 2 enhancement for destructive devices and with a downward departure from a Criminal History Category II to a Criminal History Category I. Thus Mr. King's guidelines would be 30-37 months. Considering Mr. King's age (in conjunction with his underlying health issues) and his unlikelihood to recidivate the Court should further depart downward from that number, as the U.S. Sentencing Commission specifically contemplated. Thus, if the Court is unwilling to sentence Mr. King to time served, Defense respectfully requests a sentence of 24 months.

This sentence departs downward from 30-37 months and includes a 6-month downward departure for his advanced age. As described above, elderly offenders often receive an alternative sentence or fine.

However, Mr. King's history, character, his offense conduct, his standing in the community, the needs of his family, and the purposes of sentencing, dictate that

a sufficient sentence, a reasonable sentence guided by justice, would be one of time served. That is what Mr. King respectfully asks the Court to sentence him to.

In support of this Memorandum Mr. King presents the following Exhibits:

Exhibit 1: A video created by Mr. Matthew Hancock

Exhibit 2: A Letter from William T. Link (AKA Jack or Jackie Link)

Exhibit 3: A Letter from Ms. Joann Carper

Exhibit 4: Letters from Mr. King's Sons

Exhibit 5: A Letter from Brenda Hairston

Exhibit 6: A Letter from Carolyn Robertson

Exhibit 7: A Letter from Mark Clark

Exhibit 8: A Letter from Vickie Smith

Respectfully submitted,

ROBERT LEON KING

By: *Beatrice Diehl*
Beatrice F. Diehl
Fl. Bar No. 0124667
Counsel for Defendant
Office of the Federal Public Defender
For the Western District of Virginia
210 First Street, SW, Suite 400
Roanoke, VA 24011
Ph. (540) 777-0891